FILED

2005 Mar-01  PM 02:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | | |
|---|---|---|
| VAE NORTRAK NORTH AMERICA, INC., et al., | } | |
| | } | |
| Plaintiffs, | } | CIVIL ACTION NO. |
| | } | 03-AR-1480-M |
| v. | } | |
| | } | |
| PROGRESS RAIL SERVICES CORPORATION, | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION

In the so-called *Markman* hearing held December 3,4, and 5, 2004, this court received evidence bearing on the construction of the patent claims brought by plaintiffs, VAE Nortrak North America, Inc., *et al*, (hereinafter "Nortrak"), against defendant, Progress Rail Services Corporation ("Progress"). The court has not only has read the well-written briefs of the parties, and considered the evidence offered, including the testimony of the expert witnesses, both technical and legal, but has also consulted with its own expert who attended the hearing and filed a report which the court treats as a private memorandum from its law clerks. A (not so) brief explanation of how the court reached its conclusions is called for as those conclusions are being shared with the parties.

### Discussion

The court must interpret or construe the asserted claims of two patents, patent no. 5,148,980 (hereinafter, "980") and patent

no. 5,176,318 patent ("318"). Both of these patents cover adjustable guard rail devices for use in the railroad industry. Guard rails function to keep the wheels of a train on a particular path, protecting both the train itself and the surrounding track work. Guard rails are often necessary on curves, switches, turnouts, or elevated track sections, where trains have a tendency to derail. The attractiveness of the 980 and 318 patent devices is that they allow the adjustment of the guard rails after wear and tear with less work than was previously required to adjust or replace other earlier versions of guard rails.

### *Markman* Hearings and Claim Interpretation Generally

Under the *Markman* regime, it is the duty of the court to interpret patent claims as a matter of law so that the court can thereafter instruct the jury as to the proper meaning of claims' terms and the parties can prepare their case for trial with foreknowledge of the court's intent. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)(*en banc*), *aff'd*, 517 U.S. 370 (1996). Claim interpretation is like contract interpretation. Claims should be construed using the ordinary meanings of the words to one of ordinary skill in the art, but the meaning of the words should also be considered in light of the specifications, and prosecution history. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996); *see also CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)(noting

2

that the inquiry should begin with the "intrinsic evidence," which includes the claim language, specifications, and prosecution history). The written description, and the patent claims are crucial to the public notice function of patent claims. *PSC Computer Prods., Inc. v. FoxConn International , Inc.* 355 F.3d 1353, 1358 (Fed. Cir. 2004). There is, however, a "heavy presumption" that a claim term carries its ordinary or customary meaning. *CCS Fitness*, F.3d at 1366. That "heavy presumption" cannot be overcome merely by "pointing to the preferred embodiment or other structures or steps in the specifications in the prosecution history." *Id.* The basis for such a conclusion is that the public notice function of patent law is best served when one of ordinary skill in the art can read the patent, look at the drawings, and understand exactly what device has been claimed by the patent. *See PSC Computer,* 355 F.3d at 1359. This court being extraordinarily ordinary, and not having an engineering background or bent and therefore not readily understanding the "art", it concedes that the task was not easy. When a claim term remains ambiguous in light of the intrinsic evidence, the court may look to extrinsic evidence to help resolve the ambiguity. *Id.* The Federal Circuit, which is charged with the responsibility of reviewing patent cases allows the use of dictionaries to resolve the ordinary meaning of claim terms. *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001); *see also Texas Digital Systems Inc. v. Telegenix*,

3

*Inc.* 308 F.3d 1193 (Fed. Cir. 2002) (noting that dictionaries, treatises and encyclopedias may be more useful for claim construction purposes than prosecution history or descriptions). There is little difference between the parties about the law that controls the construction of the claims in the 980 and 318. But they markedly differ in their interpretation of claim elements and terms.

### Disputed Claim Terms

There appears to be no argument between the parties about which claim terms are in dispute. Therefore, the court construes only those claims it has been asked to interpret.

Looking at the 980 patent first, the court must construe the following terms: (1) "mounting plate"; (2) "bracing member"; and (3) "retaining means." To adequately interpret the claim embodied by "mounting plate" the court must resolve the ordinary and customary meanings of the terms (1) "plate" and (2) "perforation." The interpretation of both "bracing member" and "retaining means" centers on a "means plus function" analysis, and requires the court to interpret those claims in light of any "means plus function" limitations.

In the 318 patent, the parties ask this court to construe the following claim elements: (1) "support bracket"; (2) "fastener receptacle"; and (3) "support block." Additionally, Nortrak wants a particular construction of the phrase "second vertical surface"

found in the "support block" element.

**980 Patent**

**Mounting Plate**

The primary issue with regard to the "mounting plate" itself seems to be whether or not the "plate" is necessarily "thin" as Progress claims a plate must be, or if the "plate" can also be a "thick," "built up," or in fact even a "bar or block," as suggested by Nortrak. Nortrak concedes in its brief that the ordinary definition of "plate" indicates "a relatively thin member compared with its height and width." In light of this concession, Progress has the better side of this argument. Further, the "980" patent drawings display a plate of relative thinness compared to its length and height. The ordinary meaning of a plate seems to be a piece described as "thin" and with a width and length each greater than its thickness. Nortrak's general argument that a block or a multi-piece step up system can be a "plate" seems to be an unordinary definition of the term "plate." One of ordinary skill in the art would not envision a block, or stepped up system when he reads the word "plate." Therefore, without evidence of a special meaning, "plate" will be defined in a manner consistent with Progress' definition of "plate."

Nortrak's only substantive argument on this subject appears to be to be based on the doctrine of equivalents. Nortrak argues on the assumption that the doctrine of equivalents is available, that

any structure performing the same function in substantially the same way, and with substantially similar results, is to be an equivalent structure . Under its view, Nortrak argues that a bar, or block, or a thick piece could take the place of the "plate" and therefore meet that definition. Assuming with Nortrak, that the doctrine of equivalents applies, any question of equivalence is, or may be, an issue of fact. This matter will be dealt with in more depth later in this opinion.

Further, the mounting plate must be positioned to extend "substantially parallel to the longitudinal direction" of the guard rails and main rails. The clearest construction of this language would require the mounting plate to run parallel to the main rail and guide rail with its two largest dimensions parallel to the length of the rail. While this court agrees with Progress that the largest side runs along the length of the two rails, the patent merely requires that the "plate" which is defined above, must be merely "positioned... substantially parallel" to the rails. That the plate must be positioned so that it is positioned parallel does not necessarily tell us anything about the definition of the "plate" itself. Thus, the meaning of the word "plate" is influenced very little by this reference and requirement of its proper positioning. To the extent that the "plate" could take on some form other than the one described by Progress above, it would, of course, still have to run parallel to the rails.

Beyond that, this court agrees with Progress that Nortrak's proposed construction of mounting plate is far too broad and provides detail that is not suggested or supported by anything in the patent. To the extent the "front and rear chair portions" or "ribs on the front surface of the plate" are contradicted by the claim construction given by the order, they are found not supported by the patent claim's language or the intrinsic evidence.

**Perforation**

The language of claim 1 of the 980 patent provides that a the mounting plate shall have "at least one perforation formed through" it. Further, the claw used to hold the rail in place shall extend "through said perforation." The parties dispute the meaning of the word "perforation", and what, if any limitation, that definition would have on the "mounting plate."

Progress suggests that the meaning of "perforation" to one skilled in the art is a bore or hole through the plate in the direction of its thickness. Nortrak contends that a perforation could be any opening in the mounting plate, and does not have to surrounded by plate material on all sides of the opening. Nortrak suggests that a perforation should be construed so as to include a slot, hole, or other aperture.

The choice of the word "through" following the word "perforation" indicates that the "perforation" is a hole or bore surrounded on all sides by plate material. The dictionary

definitions also disclose a similar meaning. Progress points out tellingly that *Webster's* defines a "perforation" as "a hole or pattern made by or as if by piercing or boring." *Webster's Ninth New College Dictionary* at 581 (1991).[1] This is the court's unsophisticated understanding of the term "perforation". And "perforation" is not given an esoteric meaning in the "art" here involved. The drawings and specifications show nothing like a slot, but rather show a hole through the plate. The cross sectional drawings of the 980 patent design best illustrate that this was a conceived as a hole, and not a slot extending down to the base. A "goal post" design is just not suggested by the drawings. A person skilled in the art would see the word "perforation" in the context of the patent, and would understand it to mean a "hole" through the plate.

During the hearing, great weight was put on illustrating the use of the term "perforation" in light of a sheet of notebook paper, perforated as its edges. While it may be said that these edges are perforated, this court understands that the perforation occurred while the page was still attached to the notebook, and

---

[1] The relevant definition is actually slight more interesting than that. "2 a: a hole or patten made by or as if by piercing or boring   b: one of the series **holes between rows of postage stamps** in sheet that serve as an aid in separation." *Webster's Ninth New Collegiate Dictionary* (1991) (emphasis added). The stamp related definition is especially relevant to the claim of Nortrak that the notches in stamps are in fact perforations. While they may be called that, a perforation, according to Webster's and logic, is in fact the hole punched between two stamps in sheet, it is a hole when it is formed, and not a slot. There is no mention of opening or slot as acceptable perforations. The Notrak "slot" may in fact qualify as an opening, but given our understanding that a perforation is a hole or bore, a slot cannot qualify.

thus, when formed it was a hole through the page allowing for easier tearing. Nortrak's argument is not preposterous, but it seems to the court that the word perforation means a hole or a bore, in relation to the entire "mounting plate," just as a perforation through a sheet of paper when viewed in light of the entire original sheet of paper, is a hole through the sheet of paper allowing for easy tearing, and not a goal post design.

Nortrak responds by noting that in its first embodiment, the 980 device, the "perforation" was formed at the edge of the plate. As the court sees it, this could not be any less relevant to the scope of the claim of the patent. Just because Nortrak conceived of another, perhaps better, way to build the guard rail device, does not make it part of the patent claim. Regardless of the layout of the first embodiment, the patent says what it says, and that alone delineates the boundaries of the property right which they have negotiated with the people of the United States via the Patent Office. Nortrak's choice to use a "slot" in its first design does not persuade this court that a "perforation" means a "slot" anymore than its use of no plate at all in the first embodiment would have convinced us that the "mounting plate" was an optional feature of the patent's claim.  All evidence considered, the court is convinced a person skilled in the art would understand the "perforation" here to mean "a hole or bore", and not a "slot."

**Bracing Member**

The construction of the "bracing member" element of the 980 patent, claim 1, first requires a determination of whether or not the claim must be construed as a "means plus function" element. The language of claim 1 of the 980 patent states that the device must have

> "a bracing member disposed against said second side of said mounting plate for bracing said claw against said second side of said mounting plate."

The element clearly provides a function for the member ("for bracing") but does not use the term "means" as that term is normally used to set up a "means plus function" element. Nortrak's argument on this point essentially boils down to the assertion that because it is a bracing "member" and not a bracing "means" it cannot be a "means plus function" element. Nortrak argues that the "bracing member" is a structural element. A few points bear noting here. First, the only other time the "bracing member" is referenced in claim 1 it is referenced as "said bracing **means**" (emphasis added). Nortrak contends that this is merely a typo, or at worst a poor word choice.[2]   While if the word "means" appears in the element there is a presumption it is a "means plus function" element, an element without the word "means" may still be a "means plus function" element. *Cf. Sage Prods., Inc. v. Devon Indus., Inc.*

---

[2]This element was substantially rewritten during the prosecution of the patent. That prosecution history leads the court to believe that almost any included language was for the purpose of patentability, and not, a typo or unnecessary.

126 F.3d 1420, 1427 (Fed. Cir. 1997). However, failure to use the word "means" creates a presumption that § 112(6) does not apply. *Personalized Media Comms. LLC v. ITC*, 161 F.3d 696, 703 (Fed. Cir. 1998). That presumption is rebuttable. *Id.* Therefore, the more appropriate inquiries are (1) whether the claim element is written to describe a function and (2) whether there is an absence of sufficiently defined structure, or material or acts to perform the claimed function. *See* 35 U.S.C. § 112, ¶6. [3] If so, then 35 U.S.C. § 112, ¶6 applies. *See Mas-Hamilton Group v. La Gard, Inc.*, 156 F.3d 1206, 1213-14 (Fed. Cir. 1998). This element has a clear function listed, "for bracing." The term "bracing member", or the element in general, does not disclose such structure as to make clear what a "bracing member" entails. The patent language, without reference to the specifications, connotes no structure to one ordinarily skilled in the art. In fact, the prosecution history reveals this. The element was originally written as a "spring," which defines some structure, however, the element was rewritten as a "bracing member" which according the to the specifications can include a chucking wedge, or a number of kinds of springs. The change from definite structure to indefiniteness, further connotes a "means plus function" element. Because the patent language is too

---

[3] Where the word "means" is not used, the cases suggest the inquiry is does the term used have sufficiently definite structure, or have a reasonably understood meaning in the art, such that its meaning is clearly understood. *Personalized Media*, 161 F.3d at 703-4.

indefinite in describing structure and material to explain what a "bracing member" (for bracing) is, and because there is a primary function listed, any presumption afforded is rebutted by intrinsic evidence, and resort to "means plus function analysis under 35 U.S.C. § 112, ¶6 is appropriate.[4]

The "means plus function" analysis is different from construing a general claim element, and requires application of 35 U.S.C. § 112, ¶6. The "means plus function" analysis requires that "the claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶6. Clearly, the "bracing member" must be able to be positioned against the second side of the mounting plate, and perform a bracing function. The specifications list a number of possible structures to perform the function required of the "bracing member"; such as a, leaf spring, a spring ring, a helical spring, or a chucking wedge. Looking at these specifications, and the lack of structural detail disclosed by the patent language, a person ordinarily skilled in the art would

_____

[4]As noted above, Progress argues that this element of the patent is a "means plus function" element because it does use the term "bracing means" in the second reference to the bracing function. Its argument is that "bracing member" must mean the same thing as "bracing means," because if not the use of "said bracing means" must refer to something else, or to nothing at all. Nortrak does not argue that "said bracing means" refers to anything but the "bracing member," but merely suggests that it must be a typo. While this may be true, given the lack of definiteness in this element of the claim to begin with, the reference to "said bracing means" serves to bolster the finding that this element is indeed a "means plus function" element. In fact, given this argument it is likely that there was a presumption in favor of a "means plus function" finding because of this court's need to read claim terms consistently.

understand the bracing member to be a leaf spring, spring ring, helical spring, or a chucking wedge, or possible equivalents. Nortrak essentially claims that either way this claim is interpreted, a Pandrol clip is either part of the claim for "bracing member", or is an equivalent to the springs listed above through reliance on 35 U.S.C. § 112, ¶6.

This court joins the Federal Circuit's understanding that the determination of "whether an accused device or method infringes a claim with a [means plus function] limitation... i.e. whether it is an equivalent thereof, is a question of fact." *IMS Tech., Inc*. v. *Haas Automation, Inc.*, 206 F.3d 1422, 1429-30 (Fed. Cir. 2000). This being the case, this court must leave it up to a jury to decide whether or not the Pandrol clip is an equivalent of any of the structures disclosed by the specifications. However, it does seem quite clear to the court that a complete redesign would be necessary for a Pandrol clip to serve as a bracing member.

Finally, prosecution history estoppel is available even as to "means plus function claims" under 35 U.S.C. § 112, ¶6. *See, e.g. Alpex Computer Corp. v. Nintendo Co. Ltd.*, 102 F.3d 1214, 1220-21 (Fed. Cir. 1996), *cert. denied*, 521 U.S. 1104 (1997). Therefore, the claims that equivalency is available for this claim will be taken up in light of *Festo*, etc., in the doctrine of equivalents portion of this opinion.

**Retaining Means**

Both sides readily admit that the retaining means is a "means plus function" claim. The element is spelled out as a "retaining means for contacting the claw and cooperating with said bracing means to prevent movement of the claw." The same analysis used before applies to construction of this "means plus function" element. *See* 35 U.S.C. § 112, ¶6.

In this case, the specifications clearly refer to only two structures as possible "retaining means," namely, a "chucking wedge" and a "nut." There is no other possible structure disclosed, including a Pandrol clip. Testimony indicated that while a Pandrol clip could have been meant to be included within the term "retaining means"[5] that is not the ordinarily understood meaning of the term. Therefore, it seems appropriate to construe the nut and chucking wedge as the chosen means to perform the functions listed.

The Technical Board of Appeal for the European Patent Office's report is persuasive evidence that "use of an elastic fastener such a Pandrol clip in the guard assembly of D1 would, as can readily be seen from the Figures of D1, necessitate the redesign of the prior art system on a large scale and a modification of the respective components." This court agrees, because the use of a Pandrol clip

---

[5]There was much discussion about whether or not the Austrian Patent office, and European patents in general, would have allowed for the inclusion of Pandrol clips. Indications are that the European Patent community at the time of this patent, were unlikely to allow the use of a device (here a Pandrol clip) which was ordinarily used for some other function. This is a possible explanation of the exclusion of the Pandrol clip from the patent. Ultimately, though, while this is an interesting argument, it does not bear directly on what is, or is not, included in the 980 patent from the United States.

would likely require a substantial redesign of the 980 implement.[6]
Looking at the patent and the specifications one of ordinary skill
in the art would understand the retaining means to be used in this
device to be a chucking wedge or nut. The "retaining means" claim
element will not be construed to include a Pandrol clip, or in
fact, any means outside of the nut and the chucking wedge.

This court has entertained the arguments related to the
forseeability of the Pandrol clip in light of *Warner-Jenkinson*, as
well as Nortrak's rejoinder related to the differences in the
European patent process. It seems clear from the argument before
the European Patent Board that the Pandrol clip was available at
the time the 980 concept was patented, both in Europe and in the
United States. Whether the forseeability of such a device, and the
failure to include it in specifications means that it is, in fact,
not available as either a specification or an equivalent present
questions of law arising from the undisputed fact that the Pandrol
clip was not included. The fact that the clip was not mentioned,
especially in the United States patent (European patent issues
notwithstanding) calls into serious question just how equivalent,
in light of the other elements and structures, the function of a

_____

[6] As is noted again later, it appears that the use of a Pandrol clip,
instead of a chucking wedge would require an overhaul of the device and the
inclusion of an entire element that does not exist in the patent language. The
Pandrol clip, in order to retain, or brace for that matter, would require a
block or some other face to bear against. Otherwise, the clip would not
provide any bracing or retaining function. No such bearing block exists in any
of the 980 patent disclosures.

Pandrol clip would be. However, forseeability is not the ultimately relevant fact at this point in the analysis.

That a Pandrol clip might also be able to perform some of the same functions as the chucking wedge does not make it, as a matter of law, "equivalent" to a chucking wedge or a nut for the purposes of the "means plus function" analysis. *IMS Tech., Inc*. v. *Haas Automation, Inc.*, 206 F.3d 1422, 1429-30 (Fed. Cir. 2000). In fact, if anything, it appears that a significant redesign would be necessary to facilitate the use of a Pandrol clip as the retaining means.  It would likely be necessary to add a feature not included in the 980 patent, a "bearing block" of some kind to provide a suitable backing for the Pandrol to bear against.  That being the case, this court will leave it up to a jury to decide whether or not the Pandrol clip is an equivalent of a nut or chucking wedge. *IMS Tech., Inc*. 206 F.3d at 1429-30. Nortrak's argument , however, begs the question of why, if a Pandrol clip is the equivalent of a chucking wedge, the 318 device was patentable in light of the 980 patent.

## 318 Patent

### Support Bracket

The 318 patent language includes a "support bracket" element, which it describes as:

> " a support bracket affixed to said guard rail plate having a front shelf adapted to mount a guard bar, a horizontal hook support.... a rear shelf adapted to

receive a support block".

Looking at this language it seems obvious to the court that the "horizontal hook support" is a part of the "support bracket" element.

Nortrak argues that the doctrine of claim differentiation explains how to read the patent language more broadly that this court did at first glance. The doctrine of claim differentiation dictates that the first claim must be broader, by definition, than the later more specific, and narrow, claims in the patent. Nortrak says that because Claim 2, and Claim 11, which are not asserted, more vividly and narrowly describe the horizontal hook support's location and attachment to the bracket, Claim 1 must not really require what it seems to: a horizontal hook support which is part of the support bracket. To a certain extent, Nortrak may be right on this issue. Claim 2 and Claim 11 definitely describe the horizontal hook support which "joined" the side walls, and "extend between and ... attached to each of said sides." Claim 1, because it does not discuss joining or extending between, must not require that. However, without reliance on the doctrine of equivalents, the horizontal hook support must somehow be a part of the support bracket apparatus. The doctrine of claim differentiation cannot change what is clearly written in a patent claim. Different, more specific, language in the patent must have meaning above the more general language in earlier claims. Here, in later claims the

17

support must join or attach to each side. That doctrine, however, does not in any way strike or eliminate the language that does exist in Claim 1.

The "horizontal hook support", in Claim 1, must be a part of the general support bracket element. Because no other structure for the hook support is disclosed, and no alternative is suggested, it would be inconsistent with the notice function of patent law to allow the patent to be rewritten to put the hook support elsewhere in the device. "[C]laims may be no broader than the supporting disclosure, and therefore a narrow disclosure will limit claim breadth." *Gentry Gallery, Inc. v. Berkline Corp*, 134 F.3d 1473, 1480 (Fed. Cir. 1998); *Cf. Laitrum Corp. v. Morehouse Indus. Inc.*, 143 F.3d 1456, 1462-3 (Fed. Cir. 1998) (stating that "it is entirely proper to 'use the specification in order to determine what the inventor meant by terms and phrases in the claims.'... While claims are not necessarily limited by the written description, it is relevant that nothing in the written description suggests" a certain claim construction). Looking at all of the evidence, this court finds that the only reasonable construction is that the "horizontal hook support" is a part of the "support bracket."

**Fastener Receptacle**

The "fastener receptacle" element of the hook includes the following language:

> "A hook having a front end adapted to engage one of
> a lower horizontal foot and a vertical front surface of
> the guard bar, a bottom surface adapted to engage said
> horizontal hook support and a fastener receptacle at the
> rear end thereof."

This claim language reveals nothing about the orientation of
the hole or bore which would receive one end of the elastic
fastener.  Progress argues, by relation to other claim elements,
and the specifications, that the fastener receptacle must have a
vertical orientation.  Progress notes that a plain language
interpretation of the "support block" element would require the
elastic fastener to sit in a vertical orientation, and therefore,
require the bore of fastener receptacle to do so, as well. The
drawings disclose a similar vertical orientation to the bore,
primarily to work with the support block.

All of that noted, the claim language does not require the
fastener receptacle to have a vertical orientation. While that may,
in fact, be the only way that the device can work properly in light
of the requirements of other pieces, there is nothing in the patent
that requires that the bore be vertical. If there were a way to
respect the remainder of the claim language and use a horizontal or
diagonal orientation of the fastener receptacle, the orientation of
that receptacle would still be within the patent language. This
interpretation may prove inconsistent with other constructions, but
this court cannot see any reason to instruct a jury that the
fastener receptacle must be vertical when nothing in the patent

requires verticality.

**Support Block**

The primary questions of interpretation with regard to the "support block" regard the surfaces of the support block adapted to engage the fastener. The relevant language from Claim 1 of the 318 patent includes:

> "a support block having a bottom surface adapted to
> engage said rear shelf, a first vertical surface adapted
> to engage said rear shelf, a first vertical surface
> adapted to engage a body portion of an elastic fastener,
> a second vertical surface adapted to engage a toe end of
> said elastic fastener... ."

Each side makes strong arguments about what is required to be a part of the "support block". Progress claims that the first and second surfaces must be spaced laterally from one another. There is no clear language requiring lateral spaces between the first and second sides, but Progress argues, somewhat persuasively, that logic dictates that there must be a lateral space between these two sides. However, not much in the patent language dictates that the two sides much be laterally spaced. It is clear that the sides must be distinct, i.e., that there are two separate sides ("a first" and a "second") not just one big side that contacts the fastener in two places. There must be some separation between the two sides. However, the patent language is unclear about how the sides must be spaced. However, given that the two sides must be "vertical" or "substantially vertical" (as vertical is used elsewhere in the 318

patent), and the two distinct and separate sides must contact the same object, the space separating them will have to be lateral. As this is the only construction that makes any sense, the sides must be laterally separated to contact the fastener, as long as the two sides must be "vertical" in the normal sense of the word.

However, this entire argument turns on the second portion of the debate over the construction of the "support block"—— the meaning of "vertical." If "vertical" or "substantially vertical" means what it normally does, and what it seems to in the drawings, then the space must be lateral. If "vertical" does not require any specific orientation of the block, then the space can seemingly come in either orientation. Therefore, the relevant claim construction is not whether the sides must be "spaced laterally" but whether they must be "vertical" or "substantially vertical" in the normal sense of orientation.

### Second Vertical Surface

Critical to the interpretation of the "support block" are the terms "first vertical surface" and "second vertical surface." The construction of the meaning of "vertical surface" is central to any instruction on what would required of an infringing support block.

At first glance, it seems clear that the "vertical surface" means a surface with its vertical dimension longer than its horizontal. This is the meaning of the term to one ordinarily skilled in the art. Nortrak has two arguments in favor of a

21

different construction of the "vertical surface." The arguments work in tandem. First, Nortrak notes that in the 318 patent, the terms "vertical" and "substantially vertical" are used interchangeably. Therefore, says Nortrak, every time "vertical" is used, this court should just assume it means "substantially vertical." For the second piece of its construction, Nortrak argues that if one rotates the support block ninety degrees, the surfaces still have a substantial vertical component. Therefore, its argument goes, the support block may be oriented in this fashion and the block's surfaces remain "substantially vertical."

Notwithstanding its claim that "vertical" and "substantially vertical" are completely interchangeable[7], Nortrak's argument fails for a number of reasons. Nortrak claims that if the block is rotated exactly ninety degrees, its surfaces are still "substantially vertical" across its width. However, "vertical" is used not only to describe the orientation of the block (i.e. "vertical across its width" from Nortrak's brief), it is the only descriptor of any kind given to the surface. Otherwise, it would just be a "surface adapted to engage a toe end of said fastener." The use of a different word(perhaps "rectangular", or "flat"), or no word at all, might have allowed for Nortrak's interpretation of

---

[7]In light of the conclusions drawn in the rest of this section, the difference between "vertical" and "substantially vertical" is inapposite. To the extent that the surfaces would not "vertical," the surfaces also would not be "substantially vertical" because they would be more horizontal than vertical.

the orientation of the support block. Nortrak used the word "vertical" to describe the surface, though, and without more evidence that it did not intend the ordinary, and somewhat obvious, meaning of the word "vertical" in this context, this is the construction the word must receive. Thus, while turning the support block ninety degrees would still yield some vertical component to the surface of the support block, that surface would not be accurately "described" as being "vertical" anymore.[8] Otherwise, in its original orientation in the 318 drawings, the surface could just as easily be described as a "horizontal" surface because it does have a "substantially" horizontal dimension. Basically, the argument is not that the surface is still "vertical" or "substantially vertical," it is that those words have no meaning in relation to the word horizontal in the context of this element of the 318 patent claim. This has to be false. Therefore, the "second vertical surface" means vertical, in the sense of its relation to horizontal. The support block must include two distinct surfaces, and each surface must be more "vertical" than "horizontal."

**Doctrine of Equivalents**

Relevant to the ultimate determination of whether there is an infringement is whether or not the doctrine of equivalents can

---

[8]The block turned on its side does, of course, still have a "substantially vertical" dimension. However, there has to be some distinction between merely having a vertical component, and in fact, being "vertical." The use of the stronger descriptive leads this court to believe that the surface must be more vertical than horizontal. Otherwise, use of the word horizontal would have been more descriptive and appropriate.

apply to any of the elements of the claims at issue. Infringement under the doctrine of equivalents occurs when the accused product performs substantially the same function in substantially the same way to substantially the same result as a claimed limitation. *See, e.g.*, *Warner-Jenkinson Co. v. Hilton-Davis Chem Co.*, 520 U.S. 17, 40 (1997). The question of whether the doctrine of equivalents can apply is a question of law for the court.

The doctrine of equivalents may be barred by prosecution history, or "file wrapper" estoppel. "A narrowing amendment made to satisfy any requirement of the Patent Act may give rise to an estoppel" on the use of doctrine of equivalents by a patent claimant. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (2002). Such a narrowing amendment gives rise to a rebuttable presumption that all territory between the original language and the amendment has been surrendered, and that claimant is estopped from using the doctrine of equivalents to access that ground. *Id. at* 741. However, "if the amendment was not narrowing, then prosecution history estoppel does not apply." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1366 (Fed. Cir. 2003)(*en banc*), *cert. denied*, 124 S.Ct 2018-19 (2004). When the record reveals no reason for the amendment, *Warner Jenkinson* presumes that the substantial reason for the amendment was patentability. *Pioneer Magnetics, Inc. v. Micro Linear Corp.*, 330 F.3d 1352, 1356 (Fed. Cir. 2003). Only the prosecution history

record can be used to rebut the presumption that the amendment was done for patentability reasons. *Id*. While there are other issues at stake besides "narrowing," here the debate centers on whether the amendments were narrowing, and not about the extent to which patentability was at issue, or the scope of the surrendered equivalents.

The *Festo* presumption that an equivalent has been surrendered by a narrowing amendment is rebuttable, but the patentee bears the burden of showing that a particular equivalent was not surrendered by the amendment. *Festo,* 344 F.3d at 1368. Much debate occurred between experts and attorneys on the issue of how often the *Festo* presumption is overcome. Given both sides of the argument, it seems that the presumption has in a few cases proven rebuttable.[9] However, this court, in looking at the prosecution history estoppel question focuses, primarily, on the question of whether these amendments were actually narrowing, and not on whether the presumption arising from such a narrowing amendment was rebutted.

With regard to each of the patents, Progress essentially

---

[9]This court does not see the particular relevance in determining how often the presumption can be rebutted. It seems clear that the "one out of a thousand" figure given by Progress' expert Mr. Long was on the low side. That said, it also seems equally clear that it is not normal for the presumption to be overcome. The two citations by Nortrak to cases in which the presumption was overcome are on point, and are duly noted. However, this whole debate seems rather tangential to the actual issue, which is whether or not the presumption has been rebutted *in this case.* Regardless of whether it is one out of a thousand, or thirty out of a hundred, the presumption still exists and must be overcome by evidence by Nortrak. As far as this court was concerned, the presumption was always rebuttable, because the Supreme Court said so, and not because some case actually found the presumption overcome.

argues that because of wholesale changes to the patent by the examiner, and amendments added as a result, the doctrine of equivalents is unavailable to Nortrak on either the 980("every single element") or 318(the "fourth element") patent. Further, Progress argues that the doctrine of equivalents is unavailable to Nortrak on the 318 patent to the extent that it would be used to transfer the horizontal hook support to a support block, or off of the support bracket at all. Progress claims that the "all elements" rule would block such a use of the doctrine of equivalents. With the law in mind, the patents are considered separately.

Progress paints with broad strokes in regard to the 980 patent, and rightfully so. The 980 patent had numerous changes throughout claim 1, including the addition of an entirely new claim element, the "retaining means." Progress' argument, however, boils down, essentially, to the claim that because claim 1 was substantially rewritten, the whole claim is subject to prosecution history estoppel.[10] It is very difficult to keep straight which changes relate to which element, as many pieces of elements were replaced in the claim, removed altogether, or added anew. Progress draws this court's attention, however, to a quote from *Warner-Jenkinson* which calls into question the "whole cloth" approach to

---

[10]Much of this rewriting certainly relates to the use of the original Austrian patent. Unfortunately, much of that translated language still remains. However, it does not seem particularly relevant to our consideration of what the patent says and claims as the property of Nortrak that the patent came from Austria. Thus, neither side can rely too heavily on the issues of translation for the position.

determining whether the doctrine of equivalence applies:

> the doctrine of equivalents must be applied to individual
> elements of the claim, not to the invention as a whole.

*Warner-Jenkinson*, 520 U.S. at 29. While this quote is obviously not
entirely in the context of prosecution history estoppel, it does
call into question the practice of barring equivalents based on the
entire patent, rather than looking at the individual elements. Each
of the disputed elements is considered here: the mounting plate;
the perforation; the bracing member; and the retaining means.
Beyond the fact that Progress thinks the entire 980 patent cannot
utilize the doctrine of equivalents, and Nortrak says that is not
the case, it is hard for this court to discern where the difference
of opinion would productively lead. Without much guidance on how it
should judge the degree of narrowing necessary for the prosecution
history estoppel presumption and rebuttal to being, this court
turns to the individual elements at issue in the *Markman* hearing.

The changes to the "mounting plate" element appear narrower
only in the sense that they are required to have a first side and
a second side. This change, # 3 by Nortrak, appears to be
innocuous, and thus, the mounting plate element can utilize the
doctrine of equivalents, except with regard to that change, #3.

The amendments to the "perforation" element of Claim 1 are a
tad more complicated. Aside from the assertion that all of the 980
amendments related to patentability, Progress does not do too much
to show how the changes in certain language would narrow the scope

of a particular element. The first step in analyzing whether or not prosecution history estoppel applies is that the amendment must be narrowing. In light of all the evidence, there appears to be no substantive narrowing of the perforation. Whatever the perforation included originally, it likely still includes after the amendments. The element was substantially rewritten, but mostly in ways that appear to improve the clarity of the operation of the device, or to clarify the internal references to elements of the claim (i.e. moving the language into another section of the mounting plate element). The only serious argument for "narrowing" this court sees is the change in language from "can pass" to "does pass," a change noted as #4b by Nortrak. While this language may in fact narrow the entire device by requiring a particular orientation of the claw, it does not narrow the scope of the perforation or mounting plate element because the "perforation" must exist according to the patent's claim regardless of whether the claw "can pass" or "does pass" through the perforation. The perforation element exists in exactly the same way whether or not the claw passes through it. Therefore, there seems to be no substantive narrowing of the perforation part of the mounting plate element.

Prosecution history estoppel applies to the bracing member, however. The amendments narrow the scope of this claim, and there appears to be nothing in the record to rebut either presumption, leading to the conclusion that equivalents are unavailable. The

original, and even second, formulation of the bracing part was broad.  The final formulation, as amended, is narrower, requiring that the claw have a bracing member, and not just that it "can be braced" by a spring as in the first attempt.[11] The changes were made to define the invention over prior art and to clearly define what the invention included. Nothing rebuts that explanation. Even though the function is written as a means plus function element, prosecution history estoppel can apply. *See, e.g. Alpex Computer Corp.,* 102 F.3d at 1220-21. The *Festo* presumption not being overcome, a claim construction that allows springs not listed in the specification describing possible bracing members is precluded.

Along the same lines, the retaining means element provides a similar problem. The retaining means element was added in the final patent, and was not included in the original drafts. Clearly, then, it was an amendment to the patent. Beyond that, the retaining means element certainly narrows the patent because before there was no

---

[11]Obviously, there is also some substantive broadening of the claim, in that the original "spring" is now a "bracing member." A bracing member (which includes some springs, as well as a nut or bolt which are not springs) is certainly broader than the more narrow "spring" in some ways. However, ultimately, "bracing member" is narrower in the sense that all "springs" which are not "bracing members" are now excluded. There is some ground around the term "spring" and the term "bracing member" as defined in the specifications, that narrows the claim as well. There are now some "springs" outside the realm of the "bracing member." The entire element was rewritten in a "means plus function" form to define the claim above prior art and to provide clarity (as found earlier). Prosecution history estoppel takes away whatever ground was surrendered. Thus, the presumption that Notrak surrendered springs outside the listed springs (helical spring, leaf spring, etc.) provided by the 980 patent specifications is warranted here due to narrowing. There is no indication by Nortrak that it can actually over come the *Festo* presumption.  Having not overcome the presumption, the doctrine of equivalents does not apply to "springs" outside the list of springs given in the specifications.

restriction on what, if any, retaining means would be used, and now there are some light requirements. However, the element, because it did not come into the patent until late, was always a "means plus function" element. The "retaining means" element, itself, was never amended. The patent examiner knew the legal ramifications of the insertion of the element as a "means plus function" element. A "means plus function" element has the availability of the full range of equivalents to the specified means in the patent under 35 U.S.C. § 112, ¶6.

Given all of this, it does not seem that prosecution history estoppel should bar the use of equivalents for the "retaining means" element of the 980 patent. As this court understands prosecution history estoppel, a primary purpose of such estoppel is to ensure that patentees do not gain through equivalents what they were not entitled to claim in the patent. Because the means plus function element was never amended in a way that indicates that some ground of equivalents was given up, the retaining means plus function element maintains its full compliment of equivalents.

As to the two elements at issue in the 318 patent, only the "support block" element (and not the "support bracket" element) was amended during the prosecution. The amendments, for the most part, appear only for the sake of clarity, and no discernible narrowing seems obvious from the changes noted. Looking at the text of the amendments, none of them appear to "narrow" the claim elements in

any way.[12] While there was much debate about the *Festo* issues during the hearing, Progress did not make a succinct case that these amendments were "narrowing," beyond the sort of general assertion that they were "narrowing." Nothing on the face of these indicates that they were "narrowing." Even if the amendments were in some way more narrow, this court is inclined to find that the any such narrowing changes were for the sake of clarity, and not related to patentability, overcoming the presumption that narrowing amendments relate to patentability. Therefore, the full range of equivalents is available for the support block feature insofar as no other doctrines, for instance the "all elements" rule, are all called into question.

The full range of equivalents are available for the "support bracket" element, with one notable exception. As argued by Progress, the doctrine of equivalents is not applicable on the 318 patent to the extent that Nortrak argues that functions could move from one element to another. The "all elements" rule bars the use of the "doctrine of equivalents" to transfer function, and structure from element of the patent claim to another. The intersection of the "all elements" rule and the "rule of

---

[12]Even Notrak's change #1 (as described in the brief) from "or" to "and" seemingly does not narrow the claim because the qualifier "one of" was already included in the element. While the chance reads funny (to this court), it still seems only to require the front end to be adapted to engage "one of" a lower horizontal foot and a vertical front surface. After much thought on this topic, the use of "one of" and "or" seems redundant, and therefore, the change of "or" to "and" is not narrowing.

equivalents" requires that:

> the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is **not allowed such broad play as to effectively eliminate that element in its entirety.**

*Warner-Jenkinson*, 520 U.S. at 29.

While the doctrine of equivalents may be available to the "support bracket" element claim, the outer bound of that doctrine would not allow the horizontal hook support to be moved from element of the claim to another distinct element. Nortrak has assured the court that it will respond to Progress's "tortured reading" of precedent "at the appropriate time." Perhaps this dispute will be taken up more thoroughly during summary judgment consideration. The court will leave further discussion until then, that is, unless what the court has already said is sufficiently disturbing to one side or the other for it to request a certification under 28 U.S.C. § 1292(b). For instance, if this court is incorrect in its application of the presumption against the availability of the doctrine of equivalents based upon narrowing amendments or other undisputed facts, it would be a great waste of time to try this case to a jury using erroneous principles of law that may be crucial to the outcome.

## Conclusion

There is obviously much importance placed on each particular

word of a disputed claim construction, and the court has tried with the help of its expert, to craft the wording of claim constructions so as to be helpful to the parties and the jury. It has not been easy. Meanwhile, a separate order will be entered implementing what this court sees as the appropriate claim constructions.


DONE this __1st_____ day of March, 2005.


_____

WILLIAM M. ACKER, JR.

UNITED STATES DISTRICT JUDGE