FILED

2006 Oct-25  PM 02:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| VAE NORTRAK NORTH AMERICA, INC., et al. | } } } |
| Plaintiffs and Counter-Defendants, | } } } |
| v. | } } |
| PROGRESS RAIL SERVICES CORPORATION, | } } |
| Defendant and Counter-Claimant | } } } |
| v. | } } |
| MERIDIAN TRACK PRODUCTS CORP., et al. | } } } |
| Counter-Defendants. | } |

CIVIL ACTION NO.
03-AR-1480

**MEMORANDUM OPINION**

Before coming to grips with the motions for summary judgment pending in the above-entitled patent infringement case, the court laments the fact that the House Judiciary Committee did not sooner do what it did on September 13, 2006 (H.R. 5418), namely, approve legislation creating a ten-year pilot program permitting the random assignment of patent cases to "designated judges" who request to hear such cases. If such a program had been enacted and implemented before this court was assigned the above-entitled case, this court would not only have not requested to be designated to hear patent cases, but, in recognition of what Congress correctly perceives as the inadequacy of non-specialist judges in patent

cases, would expressly have requested the case to be reassigned to one of those "designated" judges. This court hopes that its admitted inadequacy may have been somewhat ameliorated by the fact that it appointed a knowledgeable expert to help him understand the technical aspects of this dispute.

Despite its self-doubt, the court proceeds to rule upon the pending motions, the most important of which are three motions for summary judgment filed by the sole defendant, Progress Rail Services Corporation ("Progress"). The first of these seeks a declaration that, contrary to the allegations in the complaint, Progress did not infringe U.S. patent No. 5,176,318 (the "'318 patent"). This motion, if granted, will cause a dismissal of the action by VAE Nortrak North America, Inc. ("Nortrak") against Progress. The second, which if granted will also call for a dismissal of the action against Progress, seeks a declaration that the '318 patent is unenforceable due to the patent applicants' alleged inequitable conduct before the United States Patent and Trademark Office ("PTO"). Third, and alternatively, Progress asks the court to limit Nortrak's claims for damages alleged to have been caused by the alleged infringement.

Also before the court is a motion for summary judgment filed by Nortrak, as a counter-defendant, and by the other counter-defendants, Meridian Track Products Corp., Meridian Rail Information Systems Corp. (together, "Meridian"), and VAE GmbH,

seeking dismissal of Progress's antitrust counterclaim against these parties.  Counter-defendants suggest that Progress's counterclaim is merely a defensive ploy, whereas Progress counters with the suggestion that Nortrak beat it to the courthouse.

For the reasons that follow, the court finds that no genuine issues of material fact exist as to dispositive questions regarding infringement and inequitable conduct and that Progress is entitled to judgment as a matter of law on both of its motions that raise these issues.  Entry of summary judgment in favor of Progress will moot its request for a limitation of Nortrak's claim for damages.

Because genuine issues of material fact exist with regard to some but not all of Progress' antitrust counterclaim, the court will grant-in-part and deny-in-part counter-defendants' motion for summary judgment.

There are also miscellaneous motions, that will be granted and denied in accordance with the discussion in part V below.

### *Procedural History*

The procedural posture of this case is complicated.  A brief recounting of the proceedings to date will help to clarify the relative situations of the parties and to frame the relevant issues.  Nortrak and Meridian filed the original complaint against Progress on June 19, 2003, alleging that Progress infringed the '318 patent and U.S. Patent No. 5,148,980 (the "'980 patent").  At that time, VAE GmbH owned the '980 patent, Nortrak was its licensee

as to the '980 patent, and  Meridian was the owner of the '318 patent.  On May 12, 2004, nearly one year after the complaint was filed, Progress filed its first motion for summary judgment.  In that motion, Progress claimed that Nortrak lacked standing to sue for infringement of the '980 patent, and that Progress did not infringe Meridian's '318 patent as a matter of law.  On August 12, 2004, the court entered an order in which it agreed that Nortrak lacked standing to sue on the '980 patent, but that this defect was remediable under Rule 19, Fed.R.Civ.P.  The court further explained that it would defer ruling on Progress' motion with regard to the '318 patent until after the *Markman* hearing.

On September 9, 2004, in order to remedy the defect in standing, Nortrak and Meridian amended their complaint to add VAE GmbH as a plaintiff.  In its answer to the amended complaint, Progress denied that it infringed either the '980 or the '318 patent, and asserted, *inter alia*, the affirmative defense that both patents were unenforceable by reason of inequitable conduct arising from alleged misrepresentations to the United States Patent Office. Progress also filed counterclaims for a declaration of noninfringement and patent invalidity, patent misuse, and conspiracy to dominate market through improper means.  On October 13, 2004, Nortrak filed a motion seeking an order to a separate trial of Progress's patent misuse and antitrust counterclaim.  As the court indicated in an order issued on May 3, 2006, that motion

4

has, until now, been under the advisement.

Beginning on December 3, 2004, the court held a three-day *Markman* hearing. As explained in its memorandum opinion and accompanying order of March 1, 2005, the court concluded that the following disputed terms of claim 1 of the '318 patent were to have the following meanings for the remainder of the case:

- The "horizontal hook support" must be a part of the "support bracket" element of the device. It can be any horizontal surface "support bracket" which supports the bottom surface of the hook. The "support block" must include a "horizontal hook support."

- The "support block" must include two distinct sides to engage the fastener. Those two distinct sides must be "vertical" as opposed to "horizontal."

Following entry of this claim construction order, and after permitting the parties to submit supplemental argument regarding Progress's summary judgment motion in light of the court's *Markman* rulings, the court on June 23, 2005 found that no genuine issues of material fact existed with respect to any claim based on the '980 patent, or to any claim based on the '318 patent insofar as such claim relied on a theory of literal infringement. (Dkt. # 98). Accordingly, the court granted Progress's Rule 56 motion on these claims. The only possible infringement-related issue left for jury determination was whether Progress infringed the '318 patent under the doctrine of equivalents. The court granted certification for interlocutory review under 28 U.S.C. § 1292 (b), but the Court of Appeals for the Federal Circuit declined a review.

On April 7, 2006, Nortrak and Meridian submitted a motion seeking a dismissal of Meridian from the action, because Meridian had transferred to Nortrak certain assets, including ownership of the '318 patent.  On May 3, 2006, the court granted the motion, eliminating the Meridian entities as plaintiffs, but made clear that they would continue in the action as counterclaim defendants.

After the court entered its June 23, 2005 order, the parties continued to conduct discovery and to work toward obtaining expert reports.  On July 28, 2006, Progress filed the three separate motions for summary judgment now under consideration.  On August 25, 2006, counter-defendants submitted their motion for summary judgment on Progress's antitrust counterclaim.

### *Summary Judgment Facts*

Nortrak's remaining claim of infringement is based on the '318 patent, which, similar to the '980 patent, covers a boltless, adjustable guard rail devices for use in the railroad industry.  The '318 patent was issued on January 5, 1993, to Meridian's predecessor-in-interest, ABC Rail Corporation ("ABC"), based on a patent application that was filed on January 24, 1992. Thereafter, Meridian obtained ownership of the '318 patent. Prior to the filing of this action, Nortrak and Meridian entered into a cross-license of both the '980 patent and the '318 patent. After this action was commenced and before April 7, 2006, Meridian transferred certain of its assets, including ownership

6

of the '318 patent, to Nortrak.  (*See* Dkt. # 118).

If this court has learned anything about the subject matter of this controversy, it is that the function of railroad guardrails is to keep the wheels of a train on a particular path, protecting both the train itself and the surrounding track work. The primary benefit of the combination of items embodying the '318 patent is that they are put in place without the use of bolts, making them less prone to unwanted movement and permitting them to be adjusted after wear and tear with less work than their bolted counterparts.  The '318 patent contains two independent claims (claims 1 and 11) and nine dependent claims (claims 2 through 10), and Nortrak alleges that Progress infringed claims 1, 5, 9, and 10.

Claim 1 of the '318 patent reads as follows:

1. A guard rail assembly for mounting a guard bar having a vertical body element, a guard face which extends laterally from said body element and a horizontal foot which extends laterally from said body element comprising:

a guard rail plate;

a support bracket affixed to said guard rail plate having a front shelf adapted to mount a guard bar, a horizontal hook support, a front surface which faces said guard bar, a rear surface which faces away from said guard bar and a rear shelf adapted to receive a support block;

a hook having a front end adapted to engage one of a lower horizontal foot and a vertical front surface of the guard bar, a bottom surface adapted to engage said horizontal hook support and a fastener receptacle at the rear end thereof;

a support block having a bottom surface adapted to engage said rear shelf, a first vertical surface adapted to engage a

body portion of an elastic fastener, a second vertical surface
adapted to engage a toe end of said fastener and a rear surface
which faces said rear surface of said support bracket; and

the elastic fastener having a first end adapted to be
received in said fastener receptacle of said hook, a second body
portion adapted to contact said first vertical surface and said
toe end adapted to contact said second vertical surface of said
support block to simultaneously draw said hook and said guard bar
toward said front surface of said support bracket.

Claims 5, 9, and 10 of the '318 patent are dependent on, and are
thus narrower than, claim 1.

Similar to the invention claimed in the '318 patent, the
allegedly infringing device sold by Progress is a boltless,
adjustable guardrail assembly.  Although Progress's device is
somewhat reminiscent of the '318 patented device, the Progress
design holds a number of distinctive features.  First, in the
Progress device, the first and second surfaces of the support
block which engage the body and toe portions of the elastic
fastener are **horizontally** oriented.  James Remington, one of the
two named inventors on the '318 patent, had considered such
horizontal orientations during the development of the guard rail
protected by the '318 patent, but the patent eventually disclosed
and claimed only vertical surfaces.  Second, the support bracket
of the Progress design does not contain a "horizontal hook
support."  Mr. Remington testified that two functions of the
horizontal hook support are to "provide[] a way of welding the
side struts and acts as a spacer to accurately position them in
distance from one to another," and to "act[] as a support for the

hook when the clip is being driven to keep the hook from moving during application of the clip." Third, the hook which engages the guardrail in the Progress design contains a hole through the rear end of the hook, and that hole then accepts the first end of an elastic fastener in order to hold the hook fast against the guardrail. Rather than claiming a hole through the top of the hook, the '318 patent claims a "fastener receptacle" that receives the first end of the Pandrol clip.

Although Nortrak and Meridian brought this suit against Progress in 2003, Nortrak and Meridian's predecessor-in-interest were well-acquainted long before this litigation commenced. Less than three weeks after the ABC's '318 patent issued in the United States, ABC on January 21, 1993 applied for a European patent covering the same invention. The European equivalent to the '318 patent was granted on October 30, 1996 as European patent No. EP 0553055. After ABC obtained the European patent, VAE GmbH filed an opposition in the European Patent Office (EPO). In that opposition, VAE GmbH objected to the issuance of the European patent in light of European patent No. EP 402351, the European equivalent of the '980 patent. As a result of this opposition, ABC had to distinguish several features of European patent No. EP 0553055 over the cited reference. ABC accordingly advanced, *inter alia*, the following arguments before the EPO:

- "The support bracket (36) and support block (100) of ABC's invention provides a means for securely

9

> supporting the hook (70) in such a position that the elastic fastener (150) may be quickly and easily driven into place by its being received in fastener receptacle (88) of hook (70)."

- "In . . . the opponent's statement it is stated that the feature of claim 2 in EP 553 055 is disclosed in the opponent's reference.  Again, the patentee disagrees in that the reference of the opponent fails to show or disclose ABC's horizontal hook support element.  This element acts to support hook (70) when the elastic fastener is driven into place."

- "[T]he opponent states that the stepped vertical bore for receiving a fastener formed in one end of hook (70) is not inventive in view of the horizontal bore shown in EP 402 351.  ABC disagrees, the horizontal bore of the cited reference forces an element to be inserted in a horizontal orientation as opposed to the vertical orientation of the structure of EP 553 055."

The EPO ultimately accepted at least some of ABC's arguments (most of which are not listed here), rejecting VAE GmbH's opposition and concluding that the European counterpart to the '980 patent was not invalidating prior art.

ABC was obliged to distinguish the European patents in 1998, but at least one of the co-inventors named on the '318 patent was aware of the devices described in the '980 patent several years before that.  Mr. Remington testified that he had seen the Nortrak design – *i.e.*, the embodiment of what would eventually issue as the '980 patent – likely in 1990 but certainly before he filed the U.S. patent application in January 1992.  Although the '980 patent application was filed on June 4, 1990 and the patent issued on September 22, 1992, Mr. Remington testified that he was not aware that Nortrak had either applied for or been granted

patent protection on its device when he filed his U.S. patent application.  Despite Mr. Remington's and his now-deceased co-inventor, Keith Young's, knowledge of the Nortrak design, the applicants did not cite the Nortrak design as prior art at any time during the prosecution of the '318  patent.

### *Summary Judgment Standard*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Cook Biotech Inc. v. Acell, Inc.*, ___ F.3d ___ (Fed. Cir. 2006).  The court must resolve reasonable factual inferences in favor of the non-moving party and then decide whether a reasonable jury could find in favor of the non-movant.  *IMS Technology, Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1429 (Fed. Cir. 2000).  In order to defeat a motion for summary judgment, the non-movant must "come forward with specific facts showing there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (citing Fed. R. Civ. P. 56(e)).

### *Analysis*

**I.   Progress's Motion for Summary Judgment with Respect to Infringement of the '318 Patent Under the Doctrine of Equivalents**

11

Progress' motion for summary judgment with respect to infringement is the second such motion filed by Progress.  On June 23, 2005, the court granted Progress's previous motion with respect to Nortrak's and Meridian's claims of literal infringement and infringement under the doctrine of equivalents of the '980 patent, as well as with respect to the allegation of literal infringement of the '318 patent.  The court also found, however, that genuine issues of material fact remained with regard to the allegation that Progress infringed the '318 patent under the doctrine of equivalents.  In particular, the court "[could not] conclude that a movement of the horizontal hook support to the support block element from the support bracket constitutes a violation of the 'all elements rule' [of the doctrine of equivalents]," and further found that an issue of material fact existed as to whether the difference between the "vertical" surfaces of the support block described in claim 1 of the '318 patent and the horizontal surfaces of the accused devices was insubstantial.  Accordingly, the court denied Progress's motion for summary judgment with respect to Nortrak's and Meridian's claim for infringement of the '318 patent under the doctrine of equivalents.  After having engaged in additional fact discovery, Progress now presents a second motion for summary judgment, contending that undisputed evidence now renders the scope of possible equivalents so narrow that the accused device cannot infringe.

In its claims construction, the court endeavored to determine

12

"the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Inst., Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). Patent infringement occurs "when a device (or composition or method), that is literally covered by the claims or is equivalent to the claimed subject matter, is made, used, or sold, without the authorization of the patent holder, during the term of the patent." *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1476 (Fed. Cir. 1998) (citing 35 U.S.C. § 271). Progress, in its present motion, contends that the undisputed facts preclude a reasonable juror from finding that its boltless adjustable guard rails infringe the claims of the '318 patent under the doctrine of equivalents. In response, Nortrak argues it has proffered evidence raising a genuine issue as to whether such infringement has occurred. In light of its claim construction order and of the now undisputed evidence, the court agrees with Progress' position and now concludes there is no material issue of fact.

Summary judgment of noninfringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim is found in the accused device either literally or under the doctrine of equivalents. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353-54 (Fed. Cir. 1998). Nortrak characterizes the following as material disputed facts, precluding summary judgment:

1.   Nortrak claims that the support block of the Progress device

has "vertical" surfaces even though the horizontal dimension of those surfaces is greater than the vertical dimension.

2.  Nortrak says that the word "vertical" in claim 1 means "up and down" or "perpendicular to a horizontal plane" rather than "vertically elongated."

3.  Nortrak claims that the purpose and function of the horizontal hook support element of claim 1 of the '318 patent is to support the hook during assembly of the parts, regardless of the orientation or direction of insertion of the Pandrol clip.

4.  Nortrak says that Mr. Remington's testimony as to additional functions of the horizontal hook support is extrinsic evidence and should not be given any weight.

5.  Nortrak claims that the Progress device incorporates a "fastener receptacle," or the equivalent thereof, as claimed in claim 1 of the '318 patent.

6.  Nortrak says that there is no prosecution history estoppel against applying the "fastener receptacle" element of claim 1 of the '318 patent onto the part of the hook of Progress's device that engages a Pandrol clip.

7.  Nortrak claims that the hole in Progress's hook that receives the center leg of a Pandrol clip performs substantially the same function, in substantially the same way, to obtain substantially the same result, as the fastener receptacle of claim 1 of the '318 patent.

Because the court previously entered judgment in favor of Progress

on the issue of literal infringement, the patent infringement inquiry now is whether a reasonable jury could find that the Progress device contains the equivalent of every limitation recited in claim 1 of the '318 patent. *See Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005). Nortrak contends that issues 1 and 2 defeat Progress's argument that Progress's devices do not include a support block with "vertical" surfaces (or its equivalent), that issues 3 and 4 defeat Progress's argument that Progress's devices do not contain a horizontal hook support (or its equivalent), and that issues 5, 6, and 7 defeat Progress's argument that Progress's devices do not include a fastener receptacle (or its equivalent).   To clarify Nortrak's argument, Nortrak submits that the foregoing "issues of material fact" defeat Progress's motion **as to different claim limitations.** Accordingly, if the court agrees with Nortrak on some, but not all, of the seven issues identified, such would not necessarily preclude a finding of summary judgment for Progress.  In order for Progress to prevail, the court need only find that issues 1 **and** 2 , **or** issues 3 **and** 4, **or** issues 5, 6, **and** 7, are – contrary to Nortrak's assertions – **not** genuine issues of material fact.  *See id.* (explaining that in order to prove infringement, a patent holder must show that the accused device contains **each** element, literally or by equivalence, of the asserted claim).

### A.   *Doctrine of Equivalents Generally*

The doctrine of equivalents holds that, for every claim element not literally present, the accused product must contain an equivalent element. *Warner-Jenkinson v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997).  Equivalence may be found where the relevant part of the accused product performs the same function in the same way to achieve the same result as the corresponding element in the patent claim.  Alternatively, equivalence may be found where the differences between the relevant part of the accused product and the corresponding element in the patent claim are insubstantial.  However, if even one element of a claim does not appear in an accused device, either literally or by equivalents, there is no infringement as a matter of law. *Lockheed Martine Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308, 1321 (Fed. Cir. 2003).

The Federal Circuit has summarized the burden of establishing infringement under the doctrine of equivalents as follows:

> [A] patentee must . . . provide particularized testimony and linking argument as to the "insubstantiality of the differences" between the claimed invention and the accused device or process, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents.  Such evidence must be presented on a limitation-by-limitation basis.  Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice.

*Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996).

## B.    *Vertical vs. Horizontal Surfaces of the Support Block*

Neither issue 1 nor issue 2 amounts to a disputed, genuine

issue of material fact.  With respect to both, Nortrak makes
arguments that it has already made in its opposition to Progress's
first summary judgment motion, and that the court both previously
and subsequently rejected.  In that opposition, Nortrak argued that
any object with a finite vertical dimension can properly be
characterized as "vertical," regardless of the values or
proportions of the object's various dimensions.  *See* Plaintiffs'
Supplemental Memorandum in Opposition to Defendant's Renewed and
Expanded Motion for Summary Judgment, at 7-10 (Dkt. # 95).  The
court already rejected this argument in the memorandum opinion
accompanying its *Markman* order, explaining that:

> Nortrak claims that if the block is rotated exactly
> ninety degrees, its surfaces are still "substantially
> vertical" across its width.  However, "vertical" is used
> not only to describe the orientation of the block (i.e.
> "vertical across its width" from Nortrak's brief), it is
> the only descriptor of any kind given to the surface.
> Otherwise, it would just be a "surface adapted to engage
> a toe end of said fastener."  The use of a different word
> (perhaps "rectangular" or "flat"), or no word at all,
> might have allowed for Nortrak's interpretation of the
> orientation of the support block . . . .  Thus, while
> turning the support block ninety degrees would still
> yield some vertical component to the surface of the
> support block, that surface would not be accurately
> "described" as being "vertical anymore."

Memorandum Opinion dated March 1, 2005, at 22-23 (Dkt. # 91).
Moreover, in its memorandum opinion regarding Progress's first
motion for summary judgment, the court once again rejected
Nortrak's argument, explaining that:

> Progress argues that, even under the doctrine of
> equivalents, the horizontal surfaces of its support block
> cannot infringe the 318's requirement of a first and

> second 'vertical surface.'  The court agrees that the
> Progress device does not literally infringe on the 318
> patent.  However, under the doctrine of equivalents, the
> court is required to go through a more thorough analysis
> of the competing devices.

Memorandum Opinion dated June 23, 2005, at 9 (Dkt. # 97).

Apparently not satisfied with the court's prior explanation that

Progress's device does not literally infringe the '318 patent

because, *inter alia*, the Progress support block has two horizontal

– not vertical – surfaces, Nortrak now attempts to resurrect the

argument that the surfaces of the Progress device's support block

are indeed "vertical," albeit not "vertically elongated."  Nortrak

wants this court to revisit an issue that it decided, and as to

which it unsuccessfully attempted to provide a vehicle for its

appellate review.

The court reaffirms its prior ruling that the **horizontal**

surfaces of the Progress support blocks do not literally infringe

claim 1 of the '318 patent, which includes a "first **vertical**

surface" and a "second **vertical** surface" as claim limitations

(emphasis added).  To further clarify what was implicit in its June

23, 2005 opinion, the court expressly rejects Nortrak's apparent

argument that anything other than a paper-thin object, having width

and length dimensions exactly parallel to the ground, is by

definition just as "vertical" as the Washington Monument or the

Eiffel Tower.[1]  The two "genuine issues of material fact" regarding the  orientation of the support block surfaces identified by Nortrak should no longer be disputed, because the court in previous opinions has already decided them.  Moreover, issue 2 is an issue of law, not fact.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) (explaining that construing the meaning of patent claim terms is a matter of law).  The only genuine issue of material fact that was left on the table after the court's June 23, 2005 opinion and accompanying order was whether the Progress support block – which consists of two horizontal surfaces – is substantially different from the support block consisting of vertical surfaces as claimed in the '318 patent.  *See* June 23 order, at 9 (citing *Warner-Jenkinson*, 520 U.S. at 39-41).  Progress, in its present motion for summary judgment on noninfringement, argues that evidence discovered since it submitted its first summary judgment motion reveals that the scope of equivalents is so narrow that the differences between its support block and that claimed in the '318 patent cannot possibly be "insubstantial."  Nortrak does not respond to Progress's said arguments, but relies instead on the same literal infringement arguments that the court has already

---

[1] The court is advised that the average thickness of a standard sheet of copy-machine paper is roughly 0.1 millimeter, so accepting Nortrak's argument would actually mean that even a flat-lying sheet of paper is properly characterized as "vertical," albeit not "vertically elongated," since it has some finite vertical dimension.  Putting forward such an argument subtracts from other arguments that have colorable merit.

rejected.

The court agrees with Progress that the scope of possible equivalents prevents the Progress devices from infringing the '318 patent. First, Mr. Remington – a co-inventor named on the '318 patent – had considered the horizontal design before applying for the patent, but neither disclosed nor claimed it in his application. He drew sketches of the horizontal design during the development of the invention but did not identify it in the patent specification, and he testified in his deposition that he has "always felt that the vertical [design] was a better application." None of these facts are disputed. Mr. Remington's sketches and remarks indicate that he was fully aware of the possibility of using a support block having horizontal rather than vertical surfaces – such that those surfaces engaged the portions of the elastic fastener in a way that the fastener would be inserted horizontally and situated with a horizontal rather than vertical orientation – when he and his co-inventor applied for the patent.

Mr. Remington's pre-application consideration and rejection of a horizontally oriented elastic fastener, and his belief that the vertical orientation was a superior design, indicate that he did not view the different support-block designs to be equivalents. *See Tanabe Seiyaku Co., Ltd. v. United States Int'l Trade Comm'n*, 109 F.3d 726, 732-33 (Fed. Cir. 1997) (finding pre-application experiments to be relevant in determining the scope of potential equivalents). Nortrak does not disagree with this analysis or

20

conclusion, and conspicuously fails to respond to Progress's argument on this point.  Moreover, since Mr. Remington had affirmatively considered the horizontal orientation before applying for the patent, such an orientation was clearly a forseeable variation of the design when the inventors applied for the patent. A support block having horizontal surfaces adapted to support the horizontal orientation of the elastic clip, therefore, can not be considered the equivalent of a support block with vertical surfaces. *See Sage Prods., Inc. v. Devon Indus.*, Inc., 126 F.3d 1420, 1425 (Fed. Cir. 1997) (finding no infringement under the doctrine of equivalents when the allegedly infringing device was a foreseeable variation of the invention as claimed in the asserted patent).

Second, the prosecution history of the '318 patent's European counterpart indicates that the scope of equivalents to the invention does not extend to a design incorporating a support block with horizontal surfaces.  After ABC obtained the European equivalent to the '318 patent, VAE GmbH filed an opposition in the EPO.  During the course of the opposition proceedings, VAE GmbH argued that "the horizontal bore of [the European equivalent to the '980 patent] forces [the elastic fastener] to be inserted in a horizontal orientation as opposed to the vertical orientation of the structure of EP 553 055."  Nortrak points out that ABC made these arguments to distinguish the "vertical bore" of the European counterpart to **dependent claim 4** of the '318 patent from the

21

horizontal bore shown in the '980 patent's European counterpart, and should therefore not be relevant to determinations regarding **independent claim 1** of the '318 patent.[2]   Claim 4 of the '318 patent reads:

> 4. The guard rail assembly of claim 1 in which said fastener receptacle of said hook has a stepped vertical bore.

The court agrees with Nortrak that "foreign estoppel," if such a doctrine exists (a doubtful proposition), would not necessarily apply to ABC's statements since they were not made in the context of distinguishing horizontal vs. vertical surfaces of the support block.   Indeed, as Nortrak explains, the European counterpart to the '980 patent does not even claim a support-block element.   That notwithstanding, ABC's statements do indicate that the original assignee of the '318 patent believed that a structural limitation which requires an elastic fastener to be inserted vertically is patently different from one requiring horizontal insertion.   In likewise manner, the horizontal surfaces of the Progress support block require the elastic fastener to be inserted and oriented horizontally, rather than vertically.   The Federal Circuit has explained that "[r]epresentation[s] to foreign patent offices

---

[2] Incidentally, ABC's efforts before the EPO to distinguish the "vertical bore" of the '318 counterpart patent from the horizontal bore of the '980 counterpart patent defeat Nortrak's erroneous argument that the Progress support-block surfaces are indeed "vertical," albeit not "vertically elongated."   If Nortrak's "vertical vs. vertically elongated" argument is accepted, then ABC's argument to the EPO would have been based on a factual inaccuracy because, although the "vertical bore" of the '318 patent might also be "vertically elongated," it has a horizontal dimension across its diameter in addition to the vertical dimension along its length.

should be considered . . . when [they] comprise relevant evidence." *Tanabe Sieyaku Co., Ltd.*, 109 F.3d at 733 (citing *Caterpillar Tractor Co. v. Berco, S.p.A.*, 714 F.2d 1110, 1116 (Fed. Cir. 1983)). In this case, the statements ABC made to the EPO indicate that even the original assignee of the '318 patent would believe that the differences between horizontal and vertical surfaces on a support block are beyond "insubstantial."

Third, recent persuasive authority shows that the terms "horizontal" and "vertical" are so inherently at odds with each other such that one cannot be deemed the equivalent of the other. Citing the Federal Circuit's recent decisions in *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 955 (Fed. Cir. 2006), and *V-Formation, Inc. v. Benetton Group SPA*, 401 F.3d 1307, 1313 (Fed. Cir. 2005), Progress argues that the range of equivalents cannot extend to the horizontal surfaces the Progress support block because the word "vertical" in claim 1 of the '318 patent is a narrowly-drafted functional limitation, and is therefore inherently limiting. In a related argument, Progress tellingly points to recent federal precedent, including that of the Federal Circuit, that reveals that "horizontal" and "vertical" are opposite terms and thus cannot be equivalents. Nortrak has not responded to either of these arguments. The court is persuaded by Progress's analysis. As Progress observes, the Federal Circuit has determined since the court's claim construction order and since Progress submitted its first summary judgment motion that a part with a <u>concave</u> shape is

contrary to, and thus can not be the equivalent of, a part with a
convex shape, *Bicon*, F.3d at 955-56, and a district court has
recently determined that "[a]pplying a broad definition of vertical
to include horizontal would vitiate the limitation."
*STMicroelectronics, Inc v. Sandisk Corp.*, 2006 U.S. Dist. LEXIS
42469, at *24 (E.D. Tex. June 23, 2006) (emphasis added).
Moreover, the Federal Circuit has determined in an unpublished
opinion that a part of an allegedly infringing device having a
vertical orientation cannot be the equivalent of a claim limitation
properly construed to mean "horizontal orientation." *See
Magnivision, Inc v. Bonneau Co.*, 2000 WL 772323, at *7 (Fed. Cir.
June 15, 2000). Accordingly, Progress's support block element,
which has horizontal surfaces adapted to support the horizontal
orientation of an elastic fastener, cannot be the equivalent of the
'318 patent's support block, which claims vertical surfaces.

Progress finally argues that its support block with horizontal
surfaces cannot infringe under the doctrine of equivalents because
the design does not satisfy the function/way/result test, which was
discussed at length in *Hilton Davis Chemical Co. v. Warner-
Jenkinson Co.*, 62 F.3d 1512, 1518 (Fed. Cir. 1995) (in banc), *rev'd
on other grounds*, 520 U.S. 17 (1997). Progress asserts that the
function of both support blocks might be the same (providing
surfaces to engage the elastic fastener), but that the way in which
the Progress design fulfills this function is by providing
horizontal – as opposed to vertical – surfaces, and that the result

24

is a horizontally – not vertically – oriented elastic fastener. Nortrak does not respond to this argument, but the court is still not necessarily persuaded by Progress's unanswered analysis.  For example, it would seem that, arguably, regardless of the orientation of the support-block surfaces, the function of the support block in both designs could be to maintain a force sufficient to permit the hook to engage and hold fast the guard bar; that the way in which both support blocks provide the force could be by creating a space of a designated dimension between the support bracket and the rear end of the hook; and that the result could be a complete assembly in which the guard bar stays in position as though it were permanently affixed to the support bracket.  In any event, the court need not adopt Progress's function/way/result analysis in order to conclude that the Progress design does not infringe the '318 patent as a matter of law, because Nortrak does not attempt to refute and cannot refute Progress's analysis or show that only insubstantial differences exist between the '318 patent claims and the relevant element of the accused device.  Instead, Progress has proffered undisputed evidence revealing that the scope of possible equivalents is so narrow that no reasonable jury could find that the differences between its horizontal support-block surfaces and the vertical surfaces claimed in the '318 patent are "insubstantial."  *See Warner-Jenkinson*, 520 U.S. at 40 (finding that "[a]n analysis of the role played by each element in the context of the specific

patent claim will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, **or** whether the substitute element plays a role substantially different from the claimed element.") (emphasis added); *Oak Tech., Inc. v. ITC*, 248 F.3d 1316, 1331 (Fed. Cir. 2001) (finding that the function/way/result test is but one way to determine whether differences are "insubstantial").  Moreover, issues 1 and 2 identified by Nortrak are not disputed, genuine issues of material fact sufficient to overcome summary judgment – they are rather issues on which the court has already ruled.  On the basis of the foregoing, Progress is entitled to judgment that its device does not infringe independent claim 1 – and by implication, dependent claims 5, 9, and 10 – of the '318 patent under the doctrine of equivalents.

C.   *Horizontal Hook Support in Support Bracket vs. Horizontal Hook Support in Support Block*

Next, Progress asserts that it is entitled to summary judgment on Nortrak's infringement claim because its device does not have the "horizontal hook support," or its equivalent, of claim 1 of the '318 patent.  As a basis for its assertion, Progress argues that the plain language of claim 1 precludes a finding of literal infringement and that there is nothing in the Progress device which performs substantially the same functions as do the '318 patent's horizontal hook support.  In response, Nortrak argues that the Progress device incorporates a horizontal hook support, but that

such element is located in the support block in the Progress design, and that even if this is not the case, the Progress design incorporates the equivalent of the horizontal hook support.

The court agrees with Progress that no reasonable jury could find that the Progress design satisfies the function/way/result test.  Nortrak contends that the following language from the specification of the '318 patent proves that the sole function of the horizontal hook support is to "position the hook during the assembly process":

> [G]uard bar (12) is placed on support bracket (36) such that the bottom surface (44) of horizontal foot (46) rests upon front shelf (42). *** Hook (70) is moved horizontally until the curved outer end (140) of horizontal leg (86) engages either the vertical front surface (142) or the horizontal foot (46) of guard bar (12).  In this position, the bottom surface (82) of hook (70) rests upon the top surface (58) of horizontal shelf (56) . . . .

However, Mr. Remington testified in his deposition that two functions of the horizontal hook support are to "provide[] a way of welding the side struts and act[] as a spacer to accurately position them in distance from one to another" and to "act[] as a support for the hook when the clip is being driven to keep the hook from moving during application of the clip."  Nortrak does not contend that Mr. Remington's testimony was wrong or that the horizontal hook support of the '318 patent does not actually perform these functions.  Instead, Nortrak argues that the testimony is extrinsic evidence, and that it therefore cannot be used as a basis for ascertaining the function of the horizontal

hook support, based on the familiar maxim in patent law that "[w]hen intrinsic evidence is unambiguous, it is improper for the court to rely on extrinsic evidence to contradict the meaning of the claims." *Georgia Pacific Corp v. United States Gypsum Co.*, 195 F.3d 1322, 1332 (Fed. Cir. 1999).

Nortrak's argument on this point is deficient because, as Progress notes, the **function** of a particular claim element is not the same as the **meaning** of a claim term – and the court is unaware of any principle of patent law which precludes the use of sworn testimony to determine the **function** of a claim element as opposed to its **meaning**. Even if the rule regarding extrinsic evidence were to apply to a determination of a claim element's function, the court is not convinced that the portion of the '318 patent specification to which Nortrak cites explains or defines the function without ambiguity or incompleteness. The portion of the patent specification which provides that "the bottom surface (82) of hook (70) rests upon the top surface (58) of horizontal shelf (56)" does not necessarily explain, in unambiguous and complete terms, that the sole function of the claim element is to support the hook for assembly of the parts of the guard rail assembly. Certainly Mr. Remington's testimony, which consists of a direct answer to a straight question regarding the function of the claim element at issue, is more unambiguous and complete than the language of the patent specification.

Nortrak does not dispute Progress's contention that the

Progress support block does not perform the functions that Mr. Remington identified as to the horizontal hook support of the '318 patent.  And because Nortrak does not attempt to attack the substance of Mr. Remington's deposition testimony, the statements regarding the functions of the horizontal hook support in the '318 patent are also undisputed.  Therefore, the third issue identified by Nortrak – that the purpose and function of the horizontal hook support element is to support the hook during assembly of the parts – is insufficient to overcome summary judgment.  In addition, Nortrak's fourth identified issue – that Mr. Remington's testimony as to the functions of the horizontal hook support is extrinsic evidence and should not be given any weight – is not a genuine issue of material fact.  Nothing in the law precludes the court from considering Mr. Remington's statements  made during his deposition, and Nortrak does not dispute the testimony's substance.

Under the "all-elements rule," an accused product is not infringing unless it contains each limitation of the claim, either literally or by an equivalent.  *Freedman Seating Co.*, 420 F.3d at 1358 (citing *Warner-Jenkinson*, 520 U.S. at 29).  Accordingly, the all-elements rule requires that equivalence be assessed on an element-by-element basis, as opposed to from the perspective of the invention as a whole.  *Id.*  Nortrak cannot satisfy the all-elements rule with regard to the Progress device, because it is undisputed that the Progress device contains no element that performs substantially the same functions as does the horizontal hook

29

support element of claim 1 of the '318 patent.  Moreover, the Progress device cannot literally infringe, because it is undisputed that the alleged "horizontal hook support" element of the Progress design is not part of the Progress support bracket, as expressly required by claim 1.  Finally, as discussed above, neither issue 3 nor issue 4 identified by Nortrak constitutes a genuine, disputed issue of material fact.  Progress is therefore entitled to judgment that it did not infringe claims 1, 5, 9, and 10 of the '318 patent, whether literally or under the doctrine of equivalents.

### D.    *Fastener Receptacle vs. Horizontally Bored Hole*

Finally, Progress asserts that its device does not have the equivalent of the "fastener receptacle" element of the '318 patent, and that it is therefore entitled to judgment of noninfringement. Nortrak responds that a reasonable jury could easily find that the hole through the back end of the Progress hook performs substantially the same function, in substantially the same way, to achieve substantially the same result as the "fastener receptacle," and therefore infringes the '318 patent under the doctrine of equivalents.

As a preliminary matter, the court notes that it did not construe the term "fastener receptacle" in its claim-construction order of March 1, 2005.[3]  That is because neither of the parties

---

[3] The court did explain in its opinion accompanying its claim-construction order that claim 1 of the '318 patent does not require the "fastener receptacle" element to be vertically oriented, but it did not go beyond that explanation and discuss the meaning of the term.

requested it to do so in their claim-construction briefs or at the *Markman* hearing.  Progress now suggests that the court should adopt a dictionary definition of the word "receptacle" – that is, "something that receives or contains something; container." Nortrak counters that the court should not even consider Progress's noninfringement argument with respect to the fastener receptacle element, because Progress did not identify "fastener receptacle" as a disputed claim term.  The court recognizes that it "may engage in rolling claim construction, in which [it] revisits and alters its interpretation of the claim terms as its understanding of the technology evolves," *Jack Guttman, Inc v. Kopykake Enters.*, Inc., 302 F.3d 1352, 1361 (Fed. Cir. 2002), but here, the court never interpreted the term "fastener receptacle" in the first place.  In any event, the court need not, and therefore does not, construe the now-disputed term in order to find that Progress would not be entitled to summary judgment on the basis of any differences between the hole in the Progress device and the invention claimed in the '318 patent.

Even if the court were to accept Progress's proposed definition of the term "receptacle," it would find that, as applied to the "fastener receptacle" element of the '318 patent, genuine issues of material fact exist with regard to both literal infringement and infringement under the doctrine of equivalents. There may be no dispute that the hole in the Progress device does not "contain" a section of an elastic fastener in order to draw a

hook against a guard bar, but a reasonable jury might find that the hole in the Progress device "receives" a section of the elastic fastener.   Even if a jury were to conclude otherwise, it could certainly find that the hole performs substantially the same function, in substantially the same way, to obtain substantially the same result as does the fastener receptacle element of the '318 patent.   The court disagrees with Progress that the all-elements rule would preclude a jury from reaching such a conclusion.

Moreover, Progress's argument that the statements made by ABC during the EPO opposition proceeding narrow the scope of equivalents is equally unavailing.   While ABC did argue before the EPO that the device of the '318 patent "has a vertically oriented fastener receptacle for receiving one end of the Pandrol clip," and while the hole in the Progress device is horizontally, not vertically, oriented, claim 1 of the '318 patent does not limit the "fastener receptacle" to a vertical orientation.   Indeed, unlike it does for the vertical surfaces of the support block element, claim 1 does not specify **any** orientation for the fastener receptacle.   Progress should have already been aware of this fact, as it was one subject of the court's March 1, 2005 claim-construction opinion.

Perhaps ABC's statements would preclude Progress from having infringed claim 4 of the '318 patent,[4] but claim 4 is not at issue

---

[4]   To reiterate, claim 4 of the '318 patent reads: "The guard rail assembly of claim 1 in which said fastener receptacle of said hook has a stepped vertical bore."

in this action.  Accordingly, Nortrak is correct that issues 5 and 7 above constitute genuine issues of material fact.  Issue 6 is not an issue of "fact" for jury determination, but Nortrak is correct that prosecution history estoppel would not preclude a jury from finding that the hole in the Progress device is equivalent to the "fastener receptacle" of the '318 patent.

### E.   *Progress's Motion For Summary Judgment with Respect to Infringement Will be Granted.*

Although Nortrak has properly raised two genuine issues of material fact, those issues are insufficient to overcome Progress's motion for summary judgment on all noninfringement theories. Regardless of how those issues would be resolved, there are no genuine issues of material fact to avoid the conclusion that the Progress device does not include, literally or by equivalence, a "horizontal hook support" or a support block with vertical surfaces adapted to engage an elastic fastener.   Because the Progress device lacks certain elements of claim 1 of the '318 patent, Progress is entitled to judgment as a matter of law that its device does not infringe that claim. *See*, *e.g.*, *Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1333 (Fed. Cir. 2001) (explaining that under the all-limitations rule, an accused product does not infringe unless it contains **each** limitation of the asserted claim, either literally or by an equivalent).   Since claims 5, 9, and 10 – the remaining claims which Nortrak has asserted – are dependent on claim 1, Progress is also entitled to

judgment that it did not infringe those claims.

## II. Progress' Motion for Summary Judgment with Respect to Inequitable Conduct

As an alternative ground for relief, Progress argues that the '318 patent is unenforceable because of the applicants' inequitable conduct, attributable to Nortrak as the assignee of the patent. Progress affirmatively alleges and offers evidence that during the prosecution of the '318 patent, ABC and/or the named inventors intentionally failed to disclose material prior art in the form of Nortrak's boltless guard rail which was the embodiment of the '980 patent.

An alleged patent infringer may assert the affirmative defense of inequitable conduct by claiming that the patentee obtained the patent by improper conduct. *Dow Chemical Co. v. Exxon Corp.*, 139 F.3d 1470, 1478 (Fed. Cir. 1998).  If improper conduct on the part of the patentee is found, an affirmative defense is provided, namely, finding the patent unenforceable. *Id.* "Inequitable conduct occurs when a patentee breaches his or her duty to the [PTO] of 'candor, good faith, and honesty.'" *Warner-Lambert Co v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1342 (Fed. Cir. 2005). "Affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false information, coupled with an intent to deceive" the PTO may constitute inequitable conduct. *Id.* Determining inequitable conduct requires a two-step analysis: (1) the court must determine whether the

withheld information meets a threshold level of materiality and an intent to mislead the PTO; and (2) the court must weigh "the materiality and intent in light of all the circumstances to determine whether the applicant's conduct is so culpable that the patent should be held unenforceable." *Ferring B.V. v. Barr Lab.*, Inc., 437 F.3d 1181, 1186 (Fed. Cir. 2006). Clear and convincing evidence is required to establish inequitable conduct of the type necessary to bar enforcement. *Id.* With respect to materiality, information is considered material if there is a substantial likelihood that a reasonable patent examiner would have considered the information in deciding whether to issue patent. *Id.* at 1187. With respect to an intent to deceive, that intent need not be proven by direct evidence. *Id.* at 1191. In the absence of a credible explanation by the patentee, intent to deceive may be generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information. *Id.* It is important to note that "materiality does not presume intent, which is a separate and essential component of inequitable conduct." *Id.* at 1190.

The defense of inequitable conduct is "entirely equitable in nature, and thus not an issue for a jury to decide." *PerSeptive Biosystems, Inc. v. Pharmaci a Biotech, Inc.*, 225 F.3d 1315, 1318 (Fed. Cir. 2000). However, the Federal Circuit has urged caution in the granting of summary judgment based on the affirmative defense of inequitable conduct. *Id.* at 1186-87; *Paragon Podiatry*

*Lab., Inc. v. KLM Lab., Inc.*, 984 F. 2d 1182, 1190 (Fed. Cir. 1993); *Burlington Indus. Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988); *KangaROOS USA, Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1577 (Fed. Cir. 1985). "If the facts of materiality or intent are reasonably disputed, the issue is not amenable to summary judgment." *Paragon*, 984 F.2d at 1190. Nevertheless, summary judgment is appropriate on the issue of intent when there has been a failure to supply highly material information and "(1) the applicant knew of the information; (2) the applicant knew or should have known of the materiality of the information; and (3) the applicant has not provided a credible explanation for the withholding." *Ferring B.V.*, 437 F.3d at 1191.

Progress asserts that the patent applicants did not inform the PTO of material prior art in the form of VAE GmbH's boltless guard rail assembly being in existence at the time they filed the '318 patent application. Nortrak does not dispute that the '980 patent and its commercial manifestation constitute relevant prior art, that the applicants had knowledge of the Nortrak device when they applied for the '318 patent, that the prior art is material, or that the applicants did not disclose the information to the PTO when they applied for the patent. Rather, the only disputed issue of fact is that of intent. If the circumstances create no genuine issues of material fact with regard to intent, Progress is entitled to summary judgment.

Nortrak first argues, without at first citing any case law in

support, that the prior art identified by Progress is **material**, but that is not **invalidating**, so there could not have been inequitable conduct during the prosecution of the '318 patent.   In a subsequently filed surreply, Nortrak cites *Bruno Indep. Living Aids Inc. v. Acorn Mobility Serv. Ltd.*, 394 F.3d 1348, 1353 (Fed. Cir. 2005), for the proposition that prior art must be invalidating in order to render the patent unenforceable due to inequitable conduct.   Nortrak's argument is somewhat difficult to follow, because the Federal Circuit in *Bruno* seems to be saying that whether prior art is material and whether it would be invalidating can be the same inquiry, while Nortrak now concedes materiality but asserts that the prior art would not be invalidating.   In *Bruno*, the Federal Circuit explained that "[i]n evaluating materiality, [it has] consistently referred to the definition provided in 37 C.F.R. § 1.56, by which the PTO has promulgated the duty of disclosure."   *Id.* at 1352.   The Federal Circuit then referred – as Nortrak now does – to the 1992 version of 37 C.F.R. § 1.56, which provides that information is material to patentability when:

> [I]t is not cumulative to information already of record or being made of record in the application, and
>
>> (1) It establishes, by itself of in combination with other information, a prima facie case of unpatentability of a claim; or
>>
>> (2) It refutes, or is inconsistent with, a position the applicant takes in:
>>
>>> (i) Opposing an argument of unpatentability relied on by the Office, or

(ii) Asserting an argument of patentability.
37 C.F.R. § 1.56(b) (January 17, 1992).  In *Bruno*, the Federal
Circuit affirmed the district court's finding that the prior art
was material, since the prior art satisfied the criteria for
materiality specified in 37 C.F.R. § 1.56(b)(2)(ii).  394 F.3d at
1353.  Nortrak contends that the standard for materiality set forth
in the 1992 version of 37 C.F.R. § 1.56, and applied in *Bruno*,
controls in this case because that version became effective before
the inventors filed their application for the '318 patent.

Progress counters, urging the court to apply the standard for
materiality that the Federal Circuit applied in *Digital Control
Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1314 (Fed. Cir. 2006),
that prior art is material if a reasonable examiner would have
considered such prior art important in deciding whether to allow
the patent application.   The Federal Circuit in *Digital Control*
explained that the applicable standard is based in part on the
standard for materiality set forth in 37 C.F.R. § 1.56, and it
noted that the 1992 version of § 1.56 "creat[ed] an arguably
narrower standard for materiality."   437 F.3d at 1314.  After a
lengthy discussion of the different standards for materiality that
have been applied in inequitable conduct cases, however, the
Federal Circuit concluded that the "invalidating" standard and the
"reasonable examiner" standard can – and do – coexist. *See id.* at
1316.  In particular, the Federal Circuit explained that "if a
misstatement or omission is material under the new Rule 56 [37

38

C.F.R. § 1.56] standard, it is material.  Similarly, if a statement or omission is material under the "reasonable examiner" standard or under the older three tests, it is also material."  *Id.*  The Federal Circuit expressly declared that "the 'reasonable examiner' standard and [its] case law interpreting that standard were not supplanted by the PTO's adoption of new Rule 56 . . . ."  *Id.*

Given the binding opinion of the Federal Circuit that the "invalidating" and "reasonable examiner" standards are not mutually exclusive, the court will apply the latter standard.  The court does not endeavor to determine whether or not the cited prior art is "invalidating," because the court has not been presented with persuasive argument on the esoteric subject and because it does not need to do so in order to undertake the inequitable-conduct analysis.  Applying the same standard used by the Federal Circuit in its very recent *Digital Control* opinion, the court finds that the commercial embodiment of the '980 patent was material prior art, because there is no doubt that a reasonable examiner would have considered the device important in deciding whether to issue the '318 patent.  Indeed, Nortrak does not dispute Progress's assertion that the prior art Nortrak device was more relevant than the prior art actually cited against the '318 patent.  And although Nortrak does not address whether the prior art Nortrak device constituted material prior art under the "reasonable examiner" standard – it instead dedicates the entirety of its response to Progress's motion to urging the court to apply the "invalidating"

39

standard – it does not dispute that its own technical and patent-law expert conceded that the prior art should have been disclosed under the "reasonable examiner" standard.  Moreover, Nortrak does not dispute that the Nortrak prior art device was a boltless, adjustable guard rail – as is the invention claimed in the '318 patent – but that none of the cited prior art consisted of or described boltless, adjustable guard rails.[5]  Finally, it is undisputed that VAE GmbH, a plaintiff in this case, believed its '980 patent and the '318 patent to be so similar that it filed an opposition to ABC's European patent equivalent to the '318 patent based on those similarities.  This may explain why VAE GmbH was not an original plaintiff.  Accordingly, the court finds that there is no issue of material fact with regard to whether the prior art Nortrak device was "material" for the purposes of Progress's inequitable conduct claim.  Regardless of whether the Nortrak prior art device would invalidate the '318 patent, no reasonable jury could fail to conclude that a reasonable patent examiner would have considered the device important in deciding whether to grant the '318 patent.  To ask this court to fill the shoes of a reasonable patent examiner is a leap of faith, but this court is more confident in its ability to do so than it is in a jury's ability to do so.

Having determined that the prior art Nortrak device was, as a

---

[5] This particular undisputed fact also renders the Nortrak prior art device non-cumulative of any prior art actually cited during the prosecution of the '318 patent.

matter of law, "material" for purposes of the inequitable-conduct inquiry, the court must now look to the intent of the inventors in failing to disclose it during the prosecution of the '318 patent. The court has not been apprised of any direct evidence to suggest that the inventors intended to deceive the PTO by not disclosing the prior art, but intent is most often demonstrated by circumstantial evidence in inequitable-conduct cases, as in other cases. *See Ferring B.V.*, 437 F.3d at 1191. Here, the circumstantial evidence leads to no other conclusion than that the applicants for the '318 patent intended to deceive the PTO by not disclosing the prior art Nortrak device. Nortrak does not dispute that ABC, in privity with plaintiffs, was aware that it had a duty of disclosure during the prosecution of the '318 patent, that ABC was aware of the materiality of the Nortrak device, and that the '318 patent was specifically developed as a competitive alternative to the Nortrak device. Moreover, the specification of the '318 patent states that "traditionally guard rails have been non-adjustable" and that "in those assemblies which do provide an adjustment to compensate for wear of the guard fence, the adjustment typically is awkward and requires a lengthy disassembly of the guard rail assembly," but it is undisputed that the inventors failed to disclose the one adjustable guard-rail device of which they were definitely aware. There is simply no reasonable explanation, except deliberate non-disclosure, as to why the Nortrak device was not disclosed during the prosecution of the '318

41

patent.   Nortrak contends that no intent to defraud the PTO can be inferred because Mr. Remington "believed that either his counsel or his co-inventor, who were better informed as to patent and European device matters, would handle [the duty of disclosure] for the '318 patent."  Mr. Remington's attempt to disclaim responsibility for failing to disclose the prior art is unavailing, because the actions and omissions of a applicant's patent lawyer are chargeable to the applicant. *See FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 n.8 (Fed. Cir. 1987).  Moreover, Nortrak's argument that the applicants could not have engaged in inequitable conduct because the applicants' duty of disclosure was "eased" due to the PTO having changed the Rule 56 standard from the "reasonable examiner" test to the "*prima facie* invalidity" test is also unconvincing in light of the Federal Circuit's holding regarding applicable standards for materiality in *Digital Control*.  In sum, Nortrak has offered no believable explanation for why the known, material, prior art Nortrak device was not disclosed during the prosecution of the '318 patent, and Progress has identified sufficient undisputed circumstantial evidence to prove that the applicants intended to deceive the PTO through their non-disclosure.  *See Ferring B.V.*, 437 F.3d at 1191.

Notwithstanding all of the foregoing, Nortrak argues that the following are material disputed facts that preclude summary judgment:

1.   Nortrak claims that neither the inventors of the '318 patent

nor their counsel had "an evil motive" in not disclosing the prior art Nortrak device to the PTO.

2.   Nortrak says that the materiality of the prior art Nortrak device was not so great, in view of the absence from that device of at least three elements claimed in the '318 patent application, that "evil intent" could be inferred under any of the PTO Rule 56 standards.

3.   Nortrak claims that the finding of the EPO that the '318 patent is patentable in Europe over the '980 counterpart effectively negates Progress's charge of inequitable conduct by non-disclosure of the Nortrak prior art device in the U.S.

4.   Nortrak says that Progress is disabled from asserting inequitable conduct against it because of Progress's own inequitable conduct in (1) "not disclosing the '980 and '318 patented prior art in its application for its own boltless, adjustable guardrail patent," and/or in (2) "repeatedly and consistently mischaracterizing the claims of the '318 patent in suit in this case as having limitations found only in dependent claims not asserted against it."

The court respectfully disagrees with Nortrak's assertions that any of these issues constitute genuine issues of material fact that preclude entry of summary judgment for Progress.  First, Nortrak's conclusory statements regarding intent and materiality (issues # 1 and # 2) are not evidence and therefore do not create issues of fact which require resolution by trial.  *See Moore U.S.A., Inc v.*

*Standard Register Co.*, 229 F.3d 1091, 1112-13 (Fed. Cir. 2000). Although Nortrak may purport to dispute the facts regarding materiality and/or intent, none of the material facts are **reasonably** disputed in light of the undisputed evidence, and the issue of inequitable conduct is therefore amenable to summary judgment. *See Paragon*, 984 F.2d at 1190. Second, the fact that the EPO determined that the '318 counterpart patent was patentable over the '980 counterpart in Europe (issue # 3) – *after* the '318 patent was applied for and granted in the United States – is irrelevant to the questions of materiality and intent with regard to the prosecution of the '318 patent in the United States. Finally, the court is not persuaded by Nortrak's unclean hands defense (issue # 4), because Nortrak's allegations of inequitable conduct relate to a patent that is not at issue in this litigation, and because the court is not persuaded that Progress has mischaracterized the record in this case.

Being satisfied that there exists undisputed, clear and convincing evidence that the prior art Nortrak device meets the threshold level of materiality, that the applicants of the '318 patent knew of the Nortrak device when they applied for the patent, and that the applicants intended – whether or not in such a way that would indicate criminality – to mislead the PTO by failing to disclose the Nortrak device, the court finds that, under the totality of the circumstances, the applicants' conduct was so calculatedly misleading that the '318 patent should be held

unenforceable.  *See Ferring*, 437 F.3d at 1186.  Accordingly, the court will grant Progress's motion for summary judgment on inequitable conduct.  This conclusion is, of course, redundant to the extent that summary judgment is being granted against Nortrak on other grounds.

## III. Progress's Motion for Summary Judgment with Respect to Damages

Progress says that plaintiffs, if they can avoid summary judgment on Progress's motions with respect to infringement and inequitable conduct, are limited to covering a reasonable royalty for the sales of its allegedly infringing boltless guardrails that occurred after the filing of their complaint.  Because the court will grant Progress's motions for summary judgment with respect to both infringement and inequitable conduct, the question of damages becomes academic.  Progress's motion for summary judgment on damages will be denied, without prejudice, as moot.  Progress may renew its motion in the event the Federal Circuit should reverse this court's grant of summary judgment in favor of Progress.

## IV. Nortrak's Motion for Summary Judgment with Respect to Progress's Antitrust Counterclaim

### A.  *Antitrust Standing*

Counter-defendants say that they are entitled to summary judgment on all of Progress's antitrust claims because Progress lacks antitrust standing.

Sections 4 and 16 of the Clayton Act set forth potential remedies for antitrust violations.  Section 4 of that act, which

authorizes suits for money damages, states that "**any person who shall be injured** . . . by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."  15 U.S.C. § 15(a) (emphasis added). Section 16, which authorizes suits for injunctive relief, states that "[a]ny person . . . shall be entitled to sue for and have injunctive relief . . . **against threatened loss or damage** by a violation of the antitrust laws."  15 U.S.C. § 26 (emphasis added). Accordingly, Progress is entitled to relief under section 4 if it was **actually** injured by counter-defendants' alleged antitrust violations, and is entitled to relief under section 16 if it was the object of a **threat** of injury.

The court agrees with counter-defendants that Progress lacks antitrust standing to the extent Progress seeks relief under section 4 of the Clayton Act.  In order for Progress to establish standing under section 4, the court must (1) determine that Progress has suffered an "antitrust injury," and (2) that Progress is "an efficient enforcer of the antitrust laws."  *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1449 (11th Cir. 1991). Antitrust injury is defined as "injury of the type the antitrust laws were intended to prevent," *i.e.*, injury that "coincides with the public detriment tending to result from the alleged violation." *Id.* at 1449-50 (citations omitted).  Progress contends that it has

sustained antitrust injury in three respects; namely, (1) that Nortrak's intent is to initially keep prices artificially low in order to freeze Progress out of the market, (2) that it has experienced a loss of market share as a direct result of the Nortrak-Meridian asset purchase agreement, and (3) that it will be forced to buy boltless guardrails from Nortrak in the event Nortrak succeeds in this patent litigation.  Progress's first contention does not constitute a possible antitrust injury, because Progress does not aver that Nortrak has **actually** kept prices artificially low or that Progress has **actually** been frozen out of the market – it only contends that such is Nortrak's **intent**.  Without an allegation that Nortrak **actually** engaged in any of the malicious conduct, Progress could not have sustained an **actual** antitrust injury.  Moreover, Progress's third contention becomes academic in light of the court's rulings on Progress's motions with regard to infringement and inequitable conduct.  And even if Nortrak were to prevail on its infringement claims, the court most likely would be unpersuaded that Progress would thereafter be "forced" to buy Nortrak's boltless guardrails or that such would necessarily lead to an antitrust injury.

Progress's second antitrust contention is the only one that merits significant discussion, because it alleges an "injury" that Progress has actually sustained.  Progress cites the following deposition testimony of its expert witness, Steven Wiggins, as its sole piece of evidence in support of its claim that it experienced

47

a loss of market share:

> **Mr. Tankersley** [counter-defendants' counsel]: Well, if
> Meridian had gone out of business completely – that is,
> if the predictions about their continued operations had
> turned out to be wrong and . . . the company failed,
> continued on through bankruptcy and sold all its [assets]
> so it was no longer a third player, what would that have
> done to the relevant market positions of Nortrak and
> Progress Rail?

> **Dr. Wiggins:** They would have ended up closer in market
> share to one another, and that would have driven down the
> [Herfindahl-Hirschman Index] as compared to where it is
> today.

Even if Dr. Wiggins' speculation as to what "would have" happened
if Meridian had gone out of business is correct, as counter-
defendants aptly note, Progress could not have sustained an
"antitrust injury" because no such injury can result from profits
that would have been realized had competition been reduced.
*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488
(1977).  The Supreme Court in *Brunswick* explained that such an
"injury" is not "of the type the antitrust laws were intended to
prevent" because the antitrust laws "were enacted for 'the
protection of competition not competitors,'" *Id.* (quoting *Brown
Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)), and that
"[i]t is inimical to the purposes of these laws to award damages
for the type of injury claimed here." *Id.*  Accordingly, Progress's
second contention does not amount to an "antitrust injury" even if
the court takes it for granted as true.  Because there are no
genuine issues of material fact with regard to whether Progress
suffered an antitrust injury due to any of counter-defendants'

alleged antitrust violations, the court will grant counter-defendants' motion to the extent Progress seeks money damages under section 4 of the Clayton Act.

A distinct issue is whether Progress has standing to bring antitrust claims for injunctive relief under section 16 of the Clayton Act. While a plaintiff (or in this case, a counter-claimant) must show that it sustained an **actual** antitrust injury in order to have standing to sue for damages under section 4, section 16 permits a party to seek injunctive relief if there existed a **threatened** loss or damage resulting from an alleged antitrust violation. Here there are sufficient issues of material fact with regard to whether or not Progress sustained such a threat, and the court accordingly will deny counter-defendants' motion to the extent Progress seeks injunctive relief for any alleged antitrust violations under section 16 of the Clayton Act. *See Todorov* 921 F.2d at 1452 (explaining that it is possible to have standing to bring an antitrust action under section 16 but to lack standing to bring the action under section 4).

### B.   *Noerr-Pennington Immunity*

Counter-defendants also assert that they are entitled to summary judgment on Progress's antitrust counterclaim, to the extent that counterclaim is based on counter-defendants having brought this lawsuit. They claim immunity from antitrust liability under the *Noerr-Pennington* doctrine. Under that doctrine, bringing a suit to enforce a patent is protected from antitrust laws, but

49

where the litigation is "objectively baseless" and is brought with a "subjective motivation" to interfere with a competitor, *Noerr-Pennington* immunity does not apply.  *See Andrx Pharm., Inc. v Elan Corp.*, 421 F.3d 1227, 1233 (11th Cir. 2005).

The court agrees with counter-defendants that the *Noerr-Pennington* doctrine applies here.  Counter-defendants accurately point out that this litigation has been active for over three years and has survived a *Markman* hearing and one stage of summary judgment.  Progress notes that plaintiffs' claims for infringement of the '980 patent were dismissed from the case over one year ago, and argues that such is evidence of an objectively baseless lawsuit.  Even if this fact arguably constitutes such evidence – and the court has serious doubts that it does – there is no evidence that bringing the entire lawsuit as a whole was objectively baseless.  Indeed, until the date of this memorandum opinion, the court was still seriously considering whether genuine issues of material fact existed with regard to infringement of the '318 patent under the doctrine of equivalents.  This court's understanding of *Noerr-Pennington* is that the entire lawsuit – not just certain alleged claims – must be objectively baseless and brought with the requisite level of subjective mal-motive in order for the doctrine not to apply.  Moreover, without expressly finding that the '318 patent was fraudulently obtained, the court does not agree with Progress's reading of *In re Ind. Service Org.*, 203 F.3d 1332, 1336 (Fed. Cir. 2000) that *Noerr-Pennington* immunity is

inapplicable where the asserted patent was obtained through knowing and willful fraud.[6]  Accordingly, the court finds that there are no genuine issues of material fact regarding whether counter-defendants are protected under the *Noerr-Pennington* doctrine, and will grant counter-defendants motion for summary judgment insofar as Progress bases its antitrust counterclaim on counter-defendants filing this action.

### C.   *Section 2 of the Sherman Act*

Counter-defendants assert that they are entitled to summary judgment on Progress's allegation that they violated Section 2 of the Sherman Act.  The elements of a claim of **actual** monopolization under Section 2 of the Sherman Act are "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *Morris Communications Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1293-94 (11th Cir. 2004) (quoting *United States v. Grinnel Corp.*, 384 U.S. 563, 570-71 (1966).  The elements of a claim of **attempted** monopolization under Section 2 of the Sherman Act are "(1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to

---

[6] The court acknowledges that the Federal Circuit discussed the implications of obtaining a patent through fraud in the PTO in *In re Ind. Service Org.*  The court believes, however, that the discussion was made in the context of a potential analysis under *Walter Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965), not in the context of the *Noerr-Pennington* doctrine.

monopolize and (3) a dangerous probability of achieving monopoly power." *Morris Communications*, 364 F.3d at 1293 n.10 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).  The elements of a Section 2 **conspiracy** to monopolize are "(1) concerted action deliberately entered into with the specific intent of achieving a monopoly; and (2) the commission of at least one overt act in furtherance of the conspiracy." *Levine v. Central Florida Medical Affiliates, Inc.*, 72 F.3d 1538, 1556 (11th Cir. 1996) (quoting *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1446-47 (11th Cir. 1991).

Counter-defendants assert that Progress cannot sustain its Section 2 counterclaim because it (1) has failed adequately to define the relevant market, (2) has not proven that counter-defendants engaged in predatory behavior, (3) has not proven that counter-defendants had a specific intent to monopolize a relevant market, and (4) has not proven that counter-defendants conspired to monopolize a relevant market.  As a preliminary matter, the court notes that Progress does not need to prove the elements of any Section 2 violation at this stage in order for the court to deny counter-defendants' motion.  Instead, Progress must only demonstrate that there exist genuine issues of material fact.

With the appropriate summary judgment standard in mind, the court cannot find from the facts submitted to date by the parties that Section 2 of the Sherman Act was or was not violated.  The decision-maker must be fully informed of all the facts in order to

make such a decision, and there are numerous facts in dispute that require a jury to hear the evidence at trial.  Generally speaking, these facts may pertain, but are not necessarily limited, to (1) counter-defendants' market power, (2) the relevant geographic and product markets, (3) Nortrak's intent in obtaining a license to the '318 patent from ABC, (4) facts surrounding Nortrak's obtaining of a license to the '318 patent, and (5) counter-defendants' intent in the acquisition of Meridian's assets by Nortrak.   Only after hearing all the evidence can the court determine under Rule 50 whether facts are in dispute which should be determined by a jury, as the finder-of-fact, or whether this case must be decided as a matter of law.   Based on the foregoing, Progress's Section 2 counterclaim cannot be decided under Rule 56.   Accordingly, counter-defendants' motion for summary judgment on this counterclaim will be denied, without prejudice to its being re-filed if and when the unaddressed material facts become undisputed or become presented by a Rule 50 motion.

## V.   Miscellaneous Motions

In addition to the parties' summary judgment motions, there are several motions pending that are disposed by the court's summary judgment determinations.  The court takes notice that there will be no claims of patent infringement to be adjudicated at trial, and that the only claims remaining for jury determination are certain of Progress's counterclaims.   The court will accordingly deny as moot Nortrak's motion to limit non-infringement

issues to those raised at the Markman hearing (Dkt. # 153),
Progress's motion to strike Nortrak's surreply brief titled
"Identification of Genuine Issues of Material Fact (Dkt. # 190),
and counter-defendants' motion to sever and stay the causes of
action in Progress's counterclaims (Dkt. # 79). As the court has
considered Nortrak's supplemental evidentiary material in deciding
Progress's motions for summary judgment, the court will grant
Nortrak's motion for leave to file such material (Dkt. # 186).

### *Conclusion*

In light of all of the foregoing, the court expressly holds
that no genuine issue of fact exists and that Progress is
entitled to judgment as a matter of law on its motions for
summary judgment with respect to infringement and inequitable
conduct, and that Progress's motion for summary judgment on
damages is moot. The court also finds that there are no genuine
issues of material fact with regard to Progress's sham litigation
counterclaim and with regard to Progress's antitrust standing to
the extent Progress seeks damages under section 4 of the Clayton
Act, but that genuine issues of material fact remain to the
extent Progress seeks injunctive relief under section 16 of the
Clayton Act and with regard to Progress's Section 2 of the
Sherman Act counterclaim. By separate order entered
contemporaneously herewith, Progress's motions for summary
judgment on infringement and inequitable conduct will be granted,
Progress's motion for summary judgment on damages will be denied

without prejudice, and counter-defendants' motion for summary judgment will be granted in part and denied in part.

DONE this 25th day of October, 2006.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE